### In the Matter of GROWTH INDUSTRIES, INC., Debtor.

### Bankruptcy No. 79–01353–3.

United States Bankruptcy Court,
W. D. Missouri,
Western Division.

Nov. 16, 1979.

Paul Berman and Michael Roser, Kansas City, Mo., for Growth Industries, Inc.

Darwin Johnson, Kansas City, Mo., for Traders Bank.

ORDER DENYING WITHOUT PREJUDICE THE MOTION OF THE PETITIONER TO CONVERT THESE CHAPTER 11 PROCEEDINGS TO CHAPTER 7 PROCEEDINGS, TERMINATING EFFECT OF RESTRAINING ORDER, AND DIRECTING EXAMINER TO INVESTIGATE AMOUNT AND PURPOSE OF TRANSACTIONS BETWEEN DEBTOR AND GROWTH INDUSTRIES OF FLORIDA, INC.

DENNIS J. STEWART, Bankruptcy Judge.

These chapter 11 proceedings were inaugurated by the debtor on October 18, 1979, by means of its filing, through its counsel, of a request for relief without any schedules or statement of affairs. The absence, moreover, of demonstrably reliable financial data has made the early history of the proceedings one marked by the increasing vulnerability of the reorganization proceedings.

Thus, in respect to the charges made at the outset of these proceedings by the creditor Traders Bank of Kansas City, Inc., to the effect that further operation of the debtor's business would run an unconscionable risk of impairing its security interest in accounts receivable and proceeds, the paucity of verifiable available information necessitated the court's issuance of a temporary restraining order on October 19, 1979. Under the terms of that order, the business of

the debtor was permitted to continue only on condition that the accounts receivable and proceeds be maintained at a level sufficient to satisfy the security interest of Traders Bank and on condition that the debtor account to the court for its expenditures on a weekly basis.[1]

On October 22, 1979, a hearing was held on the application of the bank on the subject of whether a trustee or examiner should be appointed.[2] The grounds upon which the bank sought to predicate its demand for relief were those of fraud, dishonesty, and mismanagement, grounds which, according to the findings then made by the court, the bank could not sustain by means of the evidence then available.[3] But the evidence adduced in the course of the hearing continued to highlight the longstanding and current operational losses being suffered by the debtor, losses the extent of which could not be ascertained because of the lack of reliable books and records. It was the clear testimony of Delbert Leroy Dunmire, president, managing officer, and sole stockholder of Growth Industries, Inc., that the debtor had, for some time past, been suffering recurring monthly operational losses in an unknown amount; that the amount could not even be estimated by him, although he indeed had served throughout this period of time as the active managing officer of the debtor; and that, for some reason or other,[4] the magnitude of the loss could not readily be ascertained.

Therefore, on October 23, 1979, the court appointed an examiner for the purposes of investigating the allegations of fraud and mismanagement and the financial status of the debtor through an examination of its books and records.[5] This investigation cul-

---

1. The temporary restraining order was initially filed on October 19, 1979, and prevented any disposition of the collateral, cash or otherwise, of the Traders Bank of Kansas City, except for a sum necessary to meet the current payroll. On October 26, 1979, by means of its written order entered on that date, the court of bankruptcy, after a hearing, extended the operation of that order, but modified it to "permit the debtor to use the cash collateral available to it, but only to the extent that it shall keep at least $280,000 in cash collateral on hand at all times and shall otherwise account to the court in a sworn writing on Tuesday, October 30, 1979, as to the disposition of any cash collateral." Again, on October 30, 1979, because the examiner who had been appointed to undertake his investigation of the books and records of the debtor had not been able satisfactorily to conclude that investigation, the effect of the order was extended to the present date, pending the decision herein.

2. The prior hearings were inaugurated by means of the debtor's application for permission to use the cash collateral in which the Traders Bank had a security interest. In the course of the hearings conducted on that issue, the Traders Bank challenged the right of the debtor to make the use which they sought to make of the cash collateral and additionally orally applied for the appointment of a trustee, explicitly adverting to the statute which provides therefor.

3. The specific findings to the contrary are contained in the order entered herein on October 26, 1979, after the prior hearing of October 23, 1979. Thus, it was found that the facts adduced to the effect that, on October 20, 1979, certain vehicles were loaded on the premises of the debtor and left the premises (standing alone, and in the face of Mr. Dunmire's uncontradicted testimony to the effect that the only articles removed from the premises were some of his clothing and personal effects) could not, without more, constitute satisfactory evidence of fraud. Nor could the fact that Mr. Dunmire presented certain audits to the bank, when they were plainly marked as interim statements, not yet finalized by the auditing firm. It appeared further that, if the debtor's uncontradicted evidence were true, there may be a likelihood of rehabilitation because of its ability to replenish accounts receivable in the vicinity of $500,000 monthly, particularly when it was contended that the outstanding, performable contracts had a value of some $1 million, and when it was the opinion of Mr. Dunmire that if the operations of one of the subsidiaries could be terminated and its assets sold, Growth Industries, Inc., would constitute a profitable enterprise. But continued proceedings were made necessary by virtue of the fact that available records did not appear to have been presented which would support these conclusions.

4. But see note 3, *supra*, where it is noted that the magnitude of the loss, albeit unknown, could be attributed, in Mr. Dunmire's unsupported opinion, to the operations of the subsidiary, Corporate Charter Service, Inc.

5. Pursuant to the order of October 23, 1979, the examiner was orally instructed by the court to determine whether there were books and records to support the allegations made by the debtor which would favor the likelihood of re-

minated in no verification of the bank's allegations of fraud and dishonesty, but rather tended to show that the only obtainable evidence was that of the debtor itself, which accordingly supported a conclusion that no acts of fraud or dishonesty had taken place.[6] Similarly, the examiner's investigation of the financial status only ferreted out the conclusionary factual contentions of the debtor to the effect that, as of the year ending September 30, 1979, the debtor and its subsidiaries had suffered an operating loss in the vicinity of $200,000; that it was able to create accounts receivable at a rate approximating $500,000 per month; that it currently had a considerable balance due from "affiliates";[7] that it had some $800,000 in outstanding orders from various airlines which it could fill in the near future; and that, if a sale of one of the subsidiaries—Corporate Charter Service, Inc.—could be effected in the near future, operations might then proceed at a profit. Particularly because the last factual contention did not appear to follow from those preceding it, the court extended the operation and effect of the temporary restraining order, as now modified to grant the debtor a greater latitude of operations,[8] and charged the examiner with the additional duty of verifying the amount and collectibility of receivables collectible from "affiliates"; the monthly cost of debtor's operations; and the existence and value of the outstanding contracts.

The examiner's written report subsequently submitted pursuant to these instructions did not disclose any material findings on these crucial issues. Therefore, when the bank, on October 30, 1979, filed its motion, pursuant to § 1112(b)(1) of the Bankruptcy Code, to convert these proceedings to straight liquidation proceedings, the court set a hearing thereon for November 9, 1979, adverting, in so doing, to the necessity for production of this essential information.[9]

In the hearing subsequently conducted pursuant to that order, the debtor succeeded in proving, by virtue of an unobjected-to summary, the existence of outstanding, performable contracts from airlines of the approximate value of $900,000, but was able to make no verified, reliable showing of the contracts themselves or of the recordkeeping with respect to the other essential issues outlined above. Therefore the court directed at the conclusion of the hearing that the contracts, as well as the other records showing the monthly operating costs of the debtor and the existence of collectibility of accounts receivable from "affiliates", be produced *in camera* prior to 5:00 p. m. on Tuesday, November 13, 1979.

The debtor objects that the court thus improperly shifted the burden of production of evidence to it, contending that § 1112(b)(1), *supra*, in making continuing loss to "the estate" and the unlikelihood of rehabilitation a ground for conversion of a chapter 11 case to a chapter 7 case requires

---

habilitation and which are summarized in note 3, *supra*. And he was further directed in writing to "file his written findings herein on or before October 30, 1979, on the plaintiff's allegations that assets of the debtor were removed from its premises on October 20, 1979, in violation of the restraining order of October 19, 1979." The examiner's subsequent report to the court on the latter issue cited the evidence of the debtor and generally followed the debtor's contentions in the matter.

**6.** See note 5, *supra*.

**7.** This balance due of in excess of $1 million is further explained in the text of this memorandum.

**8.** See note 1, *supra*.

**9.** In its order of October 31, 1979, the court adverted to the necessity of determining the "reliability of the accounting summaries submitted by the debtor on October 30, 1979." The report of the examiner subsequently filed stated that the debtor was in the process of preparing "certified" and "itemized" summaries which would contain the necessary information. And the final report of the examiner, filed November 1, 1979, stating that the desired information "should be furnished by the debtor to the court," ended with the statement that he had been unable to determine "the value of the debtor's assets and liabilities and the feasibility of the debtor continuing the operation of its business" without the books and records or summaries thereof.

that a *prima facie* case be made in terms of loss *since the inception of the chapter 11 proceedings.*[10] Even if Mr. Dunmire's admissions, stated in a hearing held subsequent to the filing of the petition, that the debtor continued at that hour to operate at a loss[11] do not suffice to make a submissible case of "continuing loss," the inability to produce evidence can only be blamed on the continuing failure of the debtor to produce the books and records showing the financial status of the debtor.[12] This objection must therefore be deemed to be without merit.

In compliance with the court's oral order of November 9, 1979, the debtor Growth Industries, Inc., produced summaries (and the constituent documents) to the court *in camera* on November 13, 1979. These purport to show that since the inception of these chapter proceedings, Growth Industries, Inc., and its subsidiaries have operated at a considerable profit over cost outlay;[13] that this conclusion would be compelled even if the costs and expenses which remain unpaid should be added to those already paid;[14] that the balance due the debtor from its subsidiary Growth Industries of Florida, Inc., is approximately $377,000 rather than the over $1,000,000 previously reported;[15] that considerable

accounts receivable and proceeds thereof have been generated by the operations of the principal debtor since October 19, 1979;[16] and that there are substantial, unperformed but readily performable, contracts outstanding.[17]

If these summaries are true and correct, there can be little doubt that there is a reasonable likelihood of the rehabilitation of the debtor which precludes dismissal under § 1112(b)(1), at least for the time being. If it should be objected that the papers presented by the debtor are but unauthenticated summaries, that is insufficient to prevent the court from making the foregoing findings. For the debtor has, in accordance with the court's prior orders and the requirements of Rule 1006 of the Federal Rules of Evidence, also presented the original documents which underlie the summaries. They are available for inspection by any interested party in the court's chambers. This availability of the underlying documents substitutes for the authentication which would otherwise be required. See 5 Weinstein's Evidence ¶ 1006[06], p. 1006–12 (1978) to the following effect:

"A chart, summary, or calculation offered as evidence in civil cases without the testimony of the person responsible

---

10. It is the debtor's contention that, by reason of the statute's reference to "continuing loss to or diminution of the *estate*," (emphasis added) only loss or diminution since the filing of the petition for relief is cognizable.

11. In the course of the hearing of October 23, 1979, for instance, Mr. Dunmire testified that "(w)e have been losing money every month in the past, yes" (tr. 56) and that he did not have "any idea how much" (*id.*).

12. Furthermore, there is an evidentiary presumption that a state of affairs continues, in the absence of evidence to the contrary.

13. The "profit and loss statement" for Growth Industries, Inc., for the period from October 19, 1979, to November 8, 1979, shows sales of some $709,556.16; cost of the goods sold as $312,204.71; operating expenses of $83,680.55; and net income of $228,524.16. None of the subsidiaries is shown by the summaries submitted to be operating at a loss.

14. It is unclear from the summaries which have been submitted by the debtor whether the unpaid bills are included within the cost totals as

set forth in note 13, *supra*. But even if they are not, their total—$81,154.37—would still leave a considerable operating profit for the debtor. Cf. note 13, *supra*.

15. The relevant summary submitted by the debtor "reflects that $1,016,673.00 is due from Growth Industries of Florida, Inc., and that $638,947.00 is payable to Growth Industries of Florida, Inc., resulting in a net amount due from Growth Industries of Florida, Inc., of $377,726.00." See debtor's "Statement of Additional Evidence," filed herein on November 13, 1979, p. 1.

16. According to the summaries submitted by the debtor on November 13, 1979, the debtor's bank balance as of November 8, 1979, was $234,958.42 and the value of the "non-intercompany or affiliate" "[a]ccounts receivable" was $806,930.74.

17. Some $900,000, as noted above, have been shown by the unobjected-to summary admitted in the hearing of November 9, 1979.

for its preparation should not be objectionable as violating the hearsay rule. Availability of the original or duplicate material on which the exhibit was based should adequately substitute for the absence of the person responsible for the exhibit's preparation. Rule 1006 serves as a special exception to the hearsay rule where the chart, summary, or calculation is offered as evidence without the testimony of the person responsible for its preparation."

Of course, in order to make the availability effective in respect to all interested parties, those parties must be granted a reasonable opportunity to inspect the underlying documents. Therefore, the denial of the motion to convert these proceedings to chapter 7 proceedings must be without prejudice to its reassertion upon a demonstrable discovery that the summaries are not accurate, or authentic, or that the underlying documents themselves do not constitute reliable, admissible evidence.

The only serious allegations not purporting yet to be explained or resolved by virtue of the summaries submitted by the debtor are those relating to allegations of improper expenditures and prospective expenditures (at least some $377,000 according to the above summaries) to and through Growth Industries of Florida, Inc. The examiner who has been previously appointed by the court will be directed to investigate the amount and purpose of these expenditures and report in writing on them to the court.

It is therefore, for the foregoing reasons,

ORDERED that the motion of the petitioner Traders Bank of Kansas City, Inc. to convert these chapter 11 proceedings to chapter 7 proceedings be, and it is hereby, denied without prejudice to its reassertion in accordance with the above and foregoing considerations. It is further

ORDERED that the examiner herein investigate the financial relationship between Growth Industries, Inc., and Growth Industries of Florida, Inc., past, present and future, and render a written report of his findings to the court within 30 days of the date of entry of this order.