**In the Matter of PIED PIPER CASUALS, INC., Debtor.**

**Bankruptcy No. 84 B 10290.**

United States Bankruptcy Court, S.D. New York.

May 25, 1984.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Creditors Committee; Richard Rubin, New York City, of counsel.

Sherman & Citron & Karasik, P.C., New York City, for debtor-in-possession; Robert Kolodney, New York City, of counsel.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The Creditors Committee moves for an order converting this case from Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* (the Code) to Chapter 7 thereof pursuant to § 1112(b) of the Code on the ground of continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation.

Upon consideration of all the evidence, and having personally observed the testimony of the witnesses and their demeanor, the Court enters the following findings of fact and conclusions of law and order:

## FINDINGS OF FACT

1. The debtor, Pied Piper Casuals, Inc., filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code on February 29, 1984. An examiner was appointed on April 27, 1984 pursuant to § 1104 of the Code.

2. In the three years prior to the filing Pied Piper, according to information provided by its accountants, had, for 1982, net sales of $6,712,000, cost of goods sold of $4,941,000 (yielding a cost of goods percentage of 74%) and a net pre-tax profit of $152,000; for 1983, net sales of $11,256,000, cost of goods sold of $8,705,000 (yielding a cost of goods percentage of 77%) and a net pre-tax profit of $106,000.

3. In the ten months ending February 29, 1984 Pied Piper, according to the May 16, 1984 report of the examiner appointed herein, had net sales of $6,258,000, cost of goods sold of $5,420,000 (yielding a cost of goods percentage of 87%) and a net loss of $975,000.

4. For the ten months ending December 31, 1984 the debtor's accountants, on February 29, 1984, projected net sales of $5,910,000, cost of goods sold of $4,600,000 (yielding a cost of goods percentage of 78%) and a net loss of $92,000. Included in that projection were net sales of $550,000 for each of March and April and $950,000 for May, a loss of $130,000 for March, and

$18,000 for April and a profit of $59,000 for May.

5. In actuality, it appears, for March, the debtor experienced a loss of $112,000 on sales of only $17,700. At the end of April the debtor took *no closing inventory.* It is estimated, without any rebuttal, that for April it experienced a loss of $76,000 on sales of $17,000. For the period of May 1 to May 13, 1984 the debtor had net sales of $46,000 as compared to the forecasted $950,000 for the entire month. Were it to have a cost of goods percentage of seventy percent, the debtor would have had to have sales of $200,000 in May, 1984 to break even. Current sales are at prices below cost, thus insuring further losses. The accountants' opinion as to the ultimate profitability, testified to at the first hearing, in June, July, and August is therefore discounted since that opinion was based on projections which, in actuality for the first three months, have not occurred.

6. These results, developed by the accountants to the creditors committee, that is, the losses actually incurred in March, April and part of May, are not challenged by the debtor even though any financial analysis of the debtor must be viewed with considerable skepticism in view of the debtor's failure to maintain its books in an adequate fashion through timely and accurate entries. Indeed, the absence of meaningful records and the simplest of financial internal controls, and the discontinuance of computer services, as reflected in the examiner's report, has left the debtor unable to describe its financial condition except on the basis of the information reported in the examiner's report which information, as anyone reading the report can determine, is based largely on hearsay and the speculation of the debtor's officers.

7. During this period the debtor has instituted certain cost-cutting programs. How effective they will be in restoring Pied Piper to even a break even position is problematical. The actual effect of the introduction of some, if not all, of these measures was reflected in the April estimated loss of $76,000 and the reduction of operat-

ing expenses from $92,000 in March to $66,000 in April and the anticipated floor of $62,000 for each of May and June.

8. For the seven-month period from June 1, 1984 to December 31, 1984, the examiner, in his report, based on the debtor's books and records and the conversations with its officers (the same information apparently available to the debtor's accountants) estimated that the debtor would have net sales of $3,000,000, a cost of goods sold percentage of 70% and a net profit of $14,000.

9. This estimate was based on several critical assumptions. They include continued full implementation of cost-cutting measures and adequate financing for the payment of purchases for piecegoods and payment of contractors and overhead on a timely basis, all apparently pursuant to increased financing under a post-petition factoring agreement with Milberg Factors, pursuant to which Milberg obtained a lien and administrative priority. Most important, the examiner's estimates are based upon the assumption, initially stated to be a one million dollar to $1.5 million dollar backlog of orders on June 1, 1984, and later in that report clarified and particularized to be at least $1.2 million dollars of backlog.

10. As of May 13, 1984 the debtor had such a backlog of only $583,000 dollars, a figure estimated to have increased to $600,-000 by May 21, 1984.

11. During the hearing, the examiner submitted a written amended report. The amendment, however, was considered by him to be in error.

12. While being examined by counsel for the creditors committee, the examiner confirmed his reported estimate as reflected above. On examination by the debtor's counsel he, again, changed his estimate stating that a shipping expense of one hundred twenty thousand dollars should have been included in cost of goods sold.

13. These circumstances, together with the undisputed poor condition of the debtor's books and records and the variations from the projection by the debtor's accountants, as noted above, give rise to concern for the accuracy of the examiner's estimate and whether the assumptions on which it is based are achievable. On the basis of observation of the witnesses and their demeanor, the testimony of the creditors committee's accountant is far more credible than of the examiner, particularly in his opinion that with a sales backlog of only six hundred thousand dollars to cover the three-month period from order to delivery Pied Piper will be unable to make up the losses it has recently incurred.

14. In addition, we have great concern for the examiner's independence in this case. It appears from the way he responded to questioning from the debtor's counsel and the way that the questions were put that the examiner had discussed his testimony with the debtor or its representatives. The questions were too pat, the examiner's demeanor too cocky, as if there were a desire on the part of the examiner to defeat the motion, and his willingness to rely on information furnished by the debtor without independent scrutiny all too obvious to observors at the hearing. These factors and his repeated amending of his report belie reliance on the conclusion set forth in his report.

15. Moreover, it would appear that the cost of goods sold ratio assumed by the examiner is somewhat generous. At 70% it is significantly lower than the debtor has experienced and is at the low end of the range in this industry as reported by the examiner. While it might be correct to assume that cost-cutting measures could justify such a low ratio, the debtor's experience would seem to be to the contrary particularly if shipping charges, originally not included therein and not expressly included by the debtor's accountants in its itemization of cost of goods sold, were to be included in that percentage.

16. Even were the examiner's estimate of May 16, 1984, including a cost of goods percentage of seventy percent and including shipping charges therein, to be taken at face value, the mere change of the assumption of a $1.2 million dollar backlog of firm

orders at normal selling prices to the actual backlog of $600,000 would indicate that the debtor will trade at a loss for the seven-month period ended December 31, 1984. That can be calculated as follows:

Reduction of sales by six hundred thousand dollars would yield estimated sales of $2.4 million dollars, as testified by the examiner. A cost of goods sold percentage of seventy percent, as testified by the examiner, would amount to $1.68 million dollars leaving a gross profit of $720,000 as against overhead of $766,000, leaving a net loss of $46,000. Under this scenario the debtor would also show a ten-month loss in excess of the sum of one hundred twelve thousand dollars for March, seventy-six thousand dollars for April, and forty-six thousand dollars for the remaining nine months, all of which equals two hundred thirty-four thousand dollars, plus an undetermined loss for May.

17. Furthermore, the shortage in assumed backlog has critical implications. The cyclical nature of the garment industry is well-known. The fall season is underway for deliveries in the summer. The projections by the debtor's accountant show that August is projected for this debtor to be its heaviest sales month, sharply decreasing in September and November to sixty percent of August, and October and December to be less than thirty percent of that in August. Even without cancellation of even one order for fifty thousand dollars it appears that Pied Piper is poorly placed to take advantage of its key selling season and thereby to survive the slow months projected.

18. While the loss projected is less than the nine hundred seventy-five thousand dollars which occurred in the ten months prior to bankruptcy, the difference is attributable, it appears on this record, primarily to the cessation of one million dollars in thefts allegedly to have incurred during that period. But, the cessation of the theft problem with the engagement of a protective service and the institution of cost-cutting measures have only ceased to slow these losses, not to have stopped them. Any further steps to return this debtor to the aura of profitability in its post-petition life have not been identified. Furthermore, there was no claim that infusion of significant capital will improve the debtor's prospects, much less any identification of possible providers of such capital. This is not a company, as others have been, that can be returned to financial health with a replacement of obsolete machinery and equipment or by cutting contracting expenses through taking its work in-house. The testimony on this record is that Pied Piper has chosen a different course of farming out its work.

19. Moreover, the position of unsecured creditors appears to afford little room for further losses by the debtor. According to the examiner, unsecured creditors have claims estimated at $1.4 million dollars not including a potential claim under The Multi-Employee Pension Act were this debtor to terminate this business, the amount of which claim is not estimated by the examiner. After including a fairly speculative value for inventory that is currently selling below cost and an insurance claim for theft, only $540,000 is said to remain for creditors.

## CONCLUSIONS OF LAW

1. Section 1112(b) of the Code affords the Bankruptcy Court, upon motion by a party in interest, with discretion to convert a Chapter 11 case to Chapter 7 upon the showing of cause. H.R.Report No. 595, 95th Congress, 1st Sess., 405–06 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

2. Cause is defined by Section 1112(b)(1) to include continuing losses and the lack of a profitable rehabilitation of the debtor. The latter phrase contemplates more than probable reorganization. Implicit in the term "rehabilitation" is a return to financial good health. *E.g. In re: E. Paul Kovacs & Company, Inc.,* 16 B.R. 203, 206 (Bkrtcy.Conn.1981); *In re: Kors,* 13 B.R. 676, 5 C.B.C.2d 190 (Bkrtcy.Vt. 1981): *In re: Tolco Properties, Inc.,* 6 B.R. 482, 6 B.C.D. 913, 3 C.B.C.2d 100 (Bkrtcy.

E.D.Va.1980); 5 Colliers on Bankruptcy, 1112.03 at page 1112–15 (15th Ed.1983). In explaining the term "rehabilitation," Colliers, *supra* at page 1112–15, gives an example of a debtor-in possession requiring time afforded by the Code to reorganize and to rehabilitate itself through disposing of an unprofitable division. Infusion of new capital, repositioning of the debtor-in-possession in its industry, and reason to expect an increased demand for its goods and services are similar examples of rehabilitation.

3. But, the terms should not be so restrictive so as summarily to preclude the successful reorganization that is the goal of Chapter 11. Reorganization itself, however, contemplates the ultimate ability to demonstrate to the Court pursuant to § 1129(a)(11) of the Code that the debtor will not likely return to bankruptcy.

■ 4. Accommodation of these various concepts indicate that at the early stages of a Chapter 11 case the Court should give the debtor the benefit of the doubt where the evidence is in equipoise or indicates that pre-bankruptcy losses will not cease over a reasonable period of time. *Cf. In re: Garland Corp.,* 6 B.R. 456, 460 (Bkrtcy.D. Mass., 1980). Evidence of loss of a significant number of jobs, for example, would heighten those reasons.

5. From such considerations, the debtor, relying on *Matter of Karl A. Neise, Inc.,* 16 B.R. 602 (Bkrtcy.S.D.Fla.1981) and *In re Nielsen,* 6 B.R. 82, 6 B.C.D. 1056 (Bkrtcy.N.D.Ala.1980) attempts to glean a rule prohibiting conversion prior to the expiration of the debtor's exclusive period to propose a plan as provided in Section 1121(b) of the Code. Those cases establish no such rule. Rather, *Nielsen* holds that the failure to file a plan within that time period cannot constitute unreasonable delay under Section 1112(b)(3) of the Code, a ground not in issue here even though the one hundred twenty-day period in this case has run three-quarters of its course. *Neise* goes not even that far stating that in that case "(t)here has been no showing of loss

to or diminution of the estate." 16 B.R. at 603.

■ 6. Where the evidence indicates significant losses have been continuing in the post-petition life, the reversal of which is chancey at best, the interests of creditors come more strongly to the fore to be balanced with the goal of rehabilitation and its reasonable likelihood. The general goal of reorganization contains no command that reorganization is to be achieved in every case. The job of a debtor-in possession remains under the Code as that described by Judge Friendly—to get the creditors paid. *In re Grayson-Robinson Stores, Inc.,* 320 F.2d 940 (2d Cir.1963).

■ 7. Here the evidence is hardly in equipoise. It demonstrates continuing loss to the estate and a lack of reasonable likelihood of rehabilitation.

8. That is not to say that the debtor may never right its ship. But it is to say on the evidence presented such a possibility is not reasonably likely and, accordingly, the creditors should not be asked to bear the risk that the debtor's projections, already destroyed in March, April and May, will somehow occur particularly in light of the debtor having missed much of the fall cycle needed to survive either pursuant to those projections or those contained in the examiner's report. *See In the Matter of Maplewood Poultry Company,* 2 B.R. 545, 548 (Bkrtcy.Me.1980).

9. Further concern that the debtor may enjoy a return to good financial health lies in the debtor's unwillingness or inability to maintain accurate books and records, even to the degree of both failing to replace its bookkeeper and eliminating its usage of computers, as reported by the examiner in that portion of the examiner's report where it indicates computer usage was totally eliminated. That inability in this case is compounded by the apparent need for the examiner in his report to base his conclusions on reliance on the debtor's oral statements without meaningful verification. That only the creditors committee's ac-

countant has examined actual figures in this enhances the credibility of his testimony and his opinion of pending failure. The debtor's lack of financial credibility, in view of the accuracy of its records, hardly produces an atmosphere where all the cards are on the table so that meaningful negotiation between the debtor and its creditors, so necessary to a Chapter 11 case, can take place. Without financial credibility, it would seem hardly likely that a debtor could return to the financial good health envisioned by the term "rehabilitation."

10. It further appears that conversion is in the best interests of creditors because the risk of continuance is unacceptable. The maximum of a thirty percent return they would now enjoy could easily disappear in its entirety in the context of this case within the short period of time that the debtor has between cycles in this industry. This is a lean case with no fat to absorb the vagaries of commerce. It is in their best interest, as the committee has so determined, that their return be preserved and not be jeopardized by a chance—and, that is all it is, a chance—that the debtor might go forward.

11. The examiner's recommendation that the best course is to permit the debtor to continue in Chapter 11 takes no account of these considerations. His report is largely based on hearsay and questionable estimates and contains little if any independent verification. *See Matter of Growth Industries Inc.*, 10 B.R. 502, 5 B.C.D. 1030, 1031 (Bkrtcy.W.D.Mo.1979).

For the foregoing reasons, the motion of the creditors committee is granted. The United States Trustee is directed to appoint an interim trustee immediately. It is so ordered.