**In re PHOTO PROMOTION ASSOCIATES, INC., Debtor.**

**No. 84 B 20417.**

United States District Court, S.D. New York.

March 11, 1985.

See also 45 B.R. 878.

Barst, Mukamal & Babitt, New York City, Orseck, Orseck & Greenberg, Liberty, N.Y., for debtor; Roy Babitt, New York City, Leon Greenberg, Liberty, N.Y., of counsel.

Siegel, Sommers & Schwartz, New York City, for Official Creditors Committee; Leonard Schwartz, New York City, of counsel.

U.S. Trustee, New York City, for United States Trustee; John P. Campo, New York City, of counsel.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The United States trustee and the official creditors' committee have made separate motions under 11 U.S.C. § 1112(b) to convert this Chapter 11 reorganization case to a liquidation case under Chapter 7 of the Bankruptcy Code. The motions were consolidated for purposes of trial and determination. The debtor, Photo Promotion Associates, Inc., operates under license agreements with stores and shopping center locations which enable the debtor to set up booths at the stores on a rotating basis. The debtor specializes in taking family photographs at these locations and selling the products on wooden plaques to customers in the stores who might wish to order sets of family photographs. The orders are taken from the prints that are shown to the customers by the debtor's representatives, either in the stores or at the customers' homes.

### FINDINGS OF FACT

1. The debtor, Photo Promotion Associates, Inc. ("PPA"), filed with this court a petition for reorganization under chapter 11 of the Bankruptcy Code on October 3, 1984. It has remained in possession of its property and operates its business under 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

2. PPA operates its promotion business in three stages. During the first stage, PPA would set up promotional displays in a high traffic area in a department store or shopping center location. Customers at the store desiring the photographic products would sign up for portraits and pay a deposit. This stage is known as the pre-sell phase. No sign or other indication in the store informs the customers that they are dealing with an independent entity; they are led to believe that they are dealing with the firm that owns the store. Thus, if the photographic products are not delivered

to customers who previously paid for them, the reputation of the store owner will be adversely affected. Stage two involves a notification to the customer to arrange for a date to come to the store to have the pictures taken by a photographer engaged by the debtor. After the film is developed, the customer is notified in stage three to select the pose or set of prints which are ultimately reproduced on wooden plaques for delivery to the customer. After the customer pays PPA for the products, PPA then pays its film processor, which is a firm known as Esquire Color Labs, Inc. In order for PPA to make a profit it must sell more than the initial print. Indeed, most customers are induced to order a package at an average cost of about forty dollars.

3. One of PPA's leading store accounts, Zayre Corp., sought to dismiss the debtor from all of the Zayre stores for failing to make license payments pursuant to a written stipulation approved by this court, dated October 29, 1984. Notwithstanding this court's decision dated January 10, 1985, which allowed PPA one additional grace day within which to make the required payments, the debtor failed to comply as required. Accordingly, Zayre has evicted the debtor from its stores and has terminated their relationship. In their supporting affidavit dated December 21, 1984, submitted in opposition to Zayre's effort to terminate their relationship, counsel for the debtor stated: "Without Zayres, *PPA cannot remain in business.*" (Emphasis added). PPA' post-petition indebtedness to Zayre Corp. is in excess of $25,000.

4. The debtor has also lost the support of its main photography processor, Esquire Labs, Inc. because it has failed to comply with a court-ordered stipulation dated December 14, 1984, whereby PPA was to pay Esquire Color Labs, Inc. twelve percent of the total gross amount of all PPA's invoices to customers. In the application in support of the December 14, 1984 order establishing an escrow fund, the debtor's vice president, Michael Weber, stated that "by virtue of lack of cash flow the debtor has been unable to pay the creditor for work to be performed and *cannot maintain its financial stability* unless the laboratory turns out its work expeditiously." (Emphasis added). Nevertheless, PPA has failed to make the twelve percent post-petition payments as required, with the result that it has built up a post-petition indebtedness to Esquire Color Labs, Inc. of approximately $169,000.

5. PPA has attempted to locate another photographic developing laboratory to do the work formerly processed by Esquire Color Labs, Inc. Accordingly, PPA has selected Coppinger Color Laboratories of Cleveland, Tennessee. Coppinger has already processed 28,000 orders for PPA and is now owed in this post-petition phase approximately $172,000 for this work.

6. The United States trustee complained that during the post-petition period PPA failed to remit the federal withholding taxes that it collected from its employees and that this indebtedness had grown to nearly $100,000. During the course of this hearing it was pointed out to PPA that the indebtedness for not remitting employees' withholding taxes was a personal liability of the debtor's officers and that it was in their own interest that this obligation be paid. Accordingly, PPA presented proof that PPA recently made two payments, one for $46,536 and the other for $41,000, for a total sum in excess of $87,000. However, these funds were taken from the debtor's coffers to satisfy the withholding tax liability that should have originally been deposited in PPA's escrow tax account. Thus, PPA's current cash position has been weakened to the extent of the tax payment.

7. PPA's records reflect that for the post-petition period until December 31, 1984, PPA realized revenues of $3,303,309.17, which its bookkeeper testified meant sales. PPA's bookkeeper testified that on the day previous to her testimony she deposited $12,000 in PPA's tax account towards the payment of New York State sales taxes. She also said that PPA deposited about $4,000 in the tax account. There was no proof that all of the sums for state sales tax collected by PPA from its custom-

ers were appropriately deposited in PPA's tax escrow account with respect to its post-petition sales of $3,303,309.17.

8. PPA also incurred substantial post-petition obligations for rent which were not paid. Since the commencement of this case, PPA has failed to pay $59,304 in rent to Tall Pines Industrial Park, the landlord of its main business location in Monsey, New York. Additionally, PPA representatives in various regional sales offices have been evicted from these premises for non-payment of rent during the post-petition period. For example, PPA was evicted from its offices in Chicago, Illinois, St. Louis, Missouri and Syracuse, New York. The PPA representatives are attempting to continue their sales operations by operating out of their private homes.

9. PPA's cash position deteriorated during the post-petition period to the point when Coppinger Labs of Tennessee, the film processor which was selected by PPA to try to process the backlog of orders, was required to advance to PPA $50,000 to cover the postage cost of shipping the products to PPA's customers.

10. Esquire Color Labs is currently holding as security for its claim approximately 44,000 orders from PPA customers dating back to January of 1984. However, PPA has already assigned the proceeds from these orders to First Transcapital Corporation as security for the $300,000 loan that PPA obtained from First Transcapital Corporation pursuant to the post-petition agreement authorized by this court on January 17, 1985.

11. In view of the fact that there is a backlog in processing PPA orders, many customers have called the various department stores complaining about the failure to process the family portraits that they ordered. Some of the stores, including Zayre's and Woolworth's, have been compelled to reimburse the customers in order to protect the reputations of the various chains of stores affected by the nondelivery.

12. As a result of PPA's financial difficulties during the post-petition period, there were times when it did not have sufficient funds to cover payroll checks issued to PPA's employees. Accordingly, some of the payroll checks in January and February of 1985 were not honored by the drawer banks. However, PPA was able to make up the shortage by later paying the employees in cash. Nonetheless, PPA incurred various overdraft charges by its bank for having issued checks against uncollected funds. For example, PPA incurred overdraft charges in December of 1984 on December 4th, 6th, 7th, 12th, 13th and 18th when its overdraft position on those dates was $4,439.59, $10,266,60, $6,525.23, $7,394.69, $28,803.86 and $29,921.40, respectively.

13. PPA's failure to meet its post-petition commitments to its licensor store chains has caused it to lose three of its major promotional sources, namely Zayre Corp., Woolworth Company and Venture Stores.

14. Although PPA has failed to file its report of operations for the month of January, 1985, the evidence at the hearing reveals that PPA's sales grossed approximately $800,000 in January of 1985, whereas the accountant for the creditors' committee testified that PPA required $1,400,000 of gross receipts in each month for January, February and March of 1985 in order to break even. This break-even figure translates into about 28,000 orders per month in order to avoid incurring a loss. However, the accountant for the creditors' committee testified that based upon figures supplied by PPA's accountant, PPA sustained a $400,000 loss in November, 1984 and a $400,000 loss in December of 1984. The loss for January, 1985 was $600,000. The loss for February, 1985 was between $500,000 and $600,000.

15. Although PPA has been operating for more than five months during the post-petition period, it has not proposed any plan of reorganization, nor is it likely that PPA will be in a position to promulgate a realistic plan of reorganization in the near future. Despite the fact that it has incurred substantial post-petition debts, PPA

does not have any meaningful assets at its disposal to form the basis for any reorganization that might be acceptable to its creditors. PPA's backlog of existing orders is held by Esquire Color Labs as security for PPA's post-petition indebtedness arising under the December 14, 1984 court-approved agreement with Esquire. Moreover, there is no proof that PPA's future operations will be any more successful than its past post-petition activities, which produced additional debts. Large chain stores, such as Zayre's and Woolworth's, are concerned that PPA's inability to deliver family portraits ordered by customers in the licensor stores will obligate the chain stores to compensate their customers to the extent of hundreds of thousands of dollars in order to save their reputations. The attorney for Zayre's testified that from seventy to ninety customer complaints per day are received at Zayre's national headquarters office, apart from the numerous complaints that are submitted to the local stores. He also testified that Zayre's consumer affairs department is "paralyzed" by this problem. Woolworth's has similarly taken the position that they are responsible for the return of the deposits received by PPA for portraits ordered in the Woolworth stores. This situation poses a serious threat to Woolworth's, whose representatives are concerned as to "how to save the company from what has happened." In light of this negative picture, PPA's prospects for obtaining new chain store accounts are not enhanced.

16. Based upon the foregoing facts, it is evident that PPA has continued to incur losses during its post-petition operations thereby diminishing the estate that would otherwise be available for the satisfaction of the creditors' claims. Meanwhile the United States trustee and the creditors' committee have shown that there is no reasonable likelihood that PPA may be rehabilitated under a chapter 11 reorganization.

## DISCUSSION

■ A motion to convert a Chapter 11 reorganization case for liquidation under Chapter 7 of the Bankruptcy Code may be sustained pursuant to 11 U.S.C. § 1112(b) if the movant is able to establish cause for such conversion. One of the statutory grounds for cause delineated under 11 U.S.C. § 1112(b) is:

> (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation ....

It is settled law that the burden to establish cause for conversion to Chapter 7 rests squarely on the party seeking such relief. *See In re Economy Cab & Tool Co., Inc.,* 44 B.R. 721, 724 (Bkrtcy.D.Minn.1984); *In re Route 202 Corp.,* 37 B.R. 367, 374 (Bkrtcy.E.D.Pa.1984); *In re Earth Services, Inc.,* 27 B.R. 698, 700 (Bkrtcy.D.Vt. 1983); *In re Karl A. Neise, Inc.,* 16 B.R. 602, 603 (Bkrtcy.S.D.Fla.1981); 5 Collier on Bankruptcy ¶ 1112.03, at 1112–13 (L. King 15th ed. 1984). A party moving pursuant to 11 U.S.C. § 1112(b)(1) must therefore meet both prongs of the twofold test, namely, continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation. *In re Powell Brothers Ice Company,* 37 B.R. 104, 107 (Bkrtcy.D.Kan.1984); *In re Tracey Service Company, Inc.,* 17 B.R. 405, 409 (Bkrtcy.E. D.Pa.1982); *In re Karl A. Neise, Inc.,* 16 B.R. at 603; *In re Steak Loft of Oakdale, Inc.,* 10 B.R. 182, 185 (Bkrtcy.E.D.N.Y. 1981); *In re Alves Photo Service, Inc.,* 6 B.R. 690, 693 (Bkrtcy.D.Mass.1980).

■ Despite the fundamental purpose of Chapter 11 proceedings to rehabilitate economically distressed businesses, this goal must be compromised where the operations of the debtor in possession continually erode the interests of creditors without a bright picture for reversing these losses in the future. Section 1112(b)(1) accomodates these competing interests where there "is a sufficient showing that the debtor would continue to sustain losses or diminish the estate if the reorganization effort is permitted to proceed *and* that there exists no reasonable likelihood of rehabilitation." *In re Garland Corp.,* 6 B.R. 456, 460 (Bkrtcy. App. 1st Cir.1980). In regard to continuing

losses, one leading authority has noted that:

> The courts will have to evaluate losses on a case by case basis. Small losses over an extended period may be acceptable, whereas *large losses in a short period may indicate that rehabilitation is not likely*

3 W. Norton, Bankruptcy Law & Practice § 56.03, at 56–3 (1981) (emphasis added). Thus, conversion may be warranted in "an embryonic reorganization proceeding under section 1112(b)(1)," *In re Garland,* 6 B.R. at 460, even before the debtor's 120 day exclusive period in which to file a plan as provided under section 1121(b) has elapsed. *In re Pied Piper Casuals, Inc.,* 40 B.R. 723, 727 (Bkrtcy.S.D.N.Y.1984).

In *Pied Piper Casuals,* the court found that the debtor-in-possession had suffered losses of $188,000 in the two months following its Chapter 11 filing, and continued to experience losses into its third post-petition month. Notwithstanding the debtor-in-possession's high hopes of reversing its financial condition by releasing a backlog of customer orders and reducing costs, the court justified conversion in the early stages of the case as follows:

> Where the evidence indicates significant losses have been continuing in the post-petition life, the reversal of which is chancey [sic] at best, the interests of creditors come more strongly to the fore to be balanced with the goal of rehabilitation and its reasonable likelihood. The general goal of reorganization contains no command that reorganization is to be achieved in every case. The job of a debtor-in-possession remains under the Code as that described by Judge Friendly—to get the creditors paid. *In re Grayson-Robinson Stores, Inc.,* 320 F.2d 940 (2d Cir.1963).

40 B.R. at 727.

In the case at hand, the debtor has continued to sustain substantial losses during the post-petition period. For the months of November, 1984 through February, 1985, the total monthly losses approximate $2,000,000. The evidence reveals that this financial hemorrhage will continue to worsen because the debtor has lost three of its major chain store licensors. PPA has been evicted from various regional offices and is operating out of private homes in those areas. Its customers have had difficulties in telephoning their requests for delivery information because telephone numbers have been discontinued. Consequently, the customers have submitted their complaints to the debtor's chain store licensors, who have had to return deposits collected by the debtor in order to save their business reputations. There is no evidence that the debtor has the wherewithal to stem this negative financial picture, let alone reverse it. During the post-petition period, the debtor has been charged by its bank for issuing checks against uncollected funds and issuing payroll checks to employees that were rejected for insufficient funds, requiring the debtor to pay the employees directly in cash. Moreover, the debtor has not been able to satisfy its post-petition rent obligation to the landlord for its main business location.

In light of the foregoing dismal financial picture, which shows no sign of any improvement, a conversion to Chapter 7 is warranted. The creditors should not be required to sustain further erosion of their prospects for some recovery in order to support the debtor's unprofitable business gamble at their expense.

This negative picture is further darkened by the fact that there clearly appears to be no reasonable likelihood of rehabilitation. "Without a reasonable amount of assets and a feasibly operating business there is no logic in continuing a Chapter 11 [proceeding]." *In re 312 West 91st Street Co., Inc.,* 35 B.R. 346, 347 (Bkrtcy.S.D.N.Y. 1983) (citations omitted). The debtor is now in its sixth month of post-petition operations and has neither filed a plan of reorganization nor is it in any position to do so in the near future. Apart from continuing to sustain substantial post-petition losses to the detriment of its creditors, the debtor has insufficient capital or assets to support the promulgation of any plan of reorgani-

**460**

zation. Moreover, it has lost three of its major chain store accounts. It will be difficult for the debtor to find new accounts of equal size to replace the lost accounts, now that it is known that the debtor's failure to deliver family portraits has caused chain store accounts to refund substantial sums collected by the debtor as deposits in order to maintain the reputations of the various chain stores affected by this problem.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this core proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(1) of the Bankruptcy Amendments and Federal Judgeship Act of 1984, enacted July 10, 1984.

2. The United States trustee and the creditors' committee have established that the debtor has sustained, and will continue to sustain, a loss to or diminution of the estate and that there is an absence of a reasonable likelihood of rehabilitation, as delineated under 11 U.S.C. § 1112(b)(1).

3. Proof of the foregoing conditions constitutes appropriate cause for converting this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, because such conversion is in the best interest of creditors and the estate.

4. The consolidated motions of the United States trustee and the creditors' committee for the exercise of this court's discretion to convert this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code are granted.

SUBMIT ORDER on notice.