### In re FOUR SCORE BROADCASTING, INC., Debtor.

Douglas J. LUSTIG, as Trustee for Four Score Broadcasting, Inc., Plaintiff,

v.

SWEDEN BROADCASTING CO., INC. David P. Mance, Thomas Powers, John Scura, Defendants.

Bankruptcy Nos. 83–20522, 85–2110A.

United States Bankruptcy Court, W.D. New York.

Sept. 9, 1987.

David D. MacKnight, Rochester, N.Y., for plaintiff.

John R. Scura, Dansville, N.Y., for Sweden Broadcasting and David P. Mance.

C. Bruce Lawrence, Rochester, N.Y., for Thomas P. Powers.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

This is an adversary proceeding to recover the fair value of a radio broadcast license. The license was valued by the parties at Thirty-Two Thousand Five Hundred Dollars ($32,500).

Four Score Broadcasting, Inc. ("the Debtor") operated a radio station out of Brockport, New York. On May 17, 1983, the Debtor filed for reorganization under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101 et seq. Defendant Thomas Powers was a principal of the Debtor and its chief executive officer during the Chapter 11 proceeding.

The Debtor's reorganization strategy was to fund a Chapter 11 plan by liquidating its assets. Accordingly, advertising in the media and by word of mouth was undertaken to locate a buyer. Defendant Sweden Broadcasting Company, Inc. ("Swe-

den"), came forward with a purchase offer late in 1983. Sweden, unincorporated at that time, was a partnership whose principals were Defendants David Mance and Thomas Wamp. Negotiations with Sweden were handled by Robert Feldman, the Debtor's bankruptcy counsel.

On January 23, 1984, the negotiations produced a contract. The contract set a purchase price of One Hundred Seventy-Five Thousand Dollars ($175,000), of which Thirty-Two Thousand Five Hundred Dollars ($32,500) was allocated to the broadcast license. The remainder of the purchase price was allocated to the Debtor's realty, personalty and good will. Sweden's performance under the contract was conditioned on its acquiring 1) purchase money financing; 2) Federal Communications Commission ("FCC") approval for an assignment of the broadcast license from the Debtor to itself; and 3) this Court's approval of the proposed sale. The contract set a closing deadline of April 30, 1984.

On January 25, 1984, Sweden obtained a financing commitment sufficient to meet its monetary obligations under the contract. The commitment was effective through May 31, 1984. After the financing commitment was obtained, the parties set about gaining Court approval of the sale and in early April of 1984, a *Lionel* hearing was held. *In re Lionel*, 722 F.2d 1063 (2nd Cir.1983). At the hearing, oral approval was given the sale. A corresponding written order was later prepared by the Debtor's attorney, but never reached the Court for signature. Nevertheless, the parties proceeded with their contract, convinced that the condition of obtaining Court approval had been satisfied. Effective April 11, 1984, Sweden acquired FCC approval to take an assignment of the Debtor's license. The approval was effective for sixty days. Failure to transfer the license within that time would result in the approval lapsing.

With the three conditions precedent to performance satisfied, Sweden was prepared to go forward with the purchase by mid-April of 1984. The transaction could not be consummated, however, because judgments and liens against the Debtor's real property prompted Sweden's purchase money lender to waffle at disbursing funds. In response to this impediment, the parties moved the closing deadline forward to May 31, 1984, hoping that title to the real property could be cleared by that time. In early May, however, it became apparent that the deal would not close by month's end. Also becoming clear was that the Debtor's operation had waned to near the vanishing point. Broadcasts were limited to three hours per day, whereas eighteen hours of daily broadcasting was required under applicable FCC licensing regulations. As well, the sixty day time limit within which the Debtor could assign its license to Sweden had dwindled to thirty-five days. Taken together, the Debtor's inability to deliver good title, its failure to assign the license and the impending collapse of operations at the radio station threatened to kill the sale. To rescue it, the Debtor's attorney and Defendant Mance reached an oral agreement on May 8, 1984.

The agreement provided that the license portion of the contract would close in escrow and Sweden would take an assignment. Sweden was willing to go forward in this manner because the license was unencumbered and not suspected of title defects. The escrow deposit was to equal the contract value of the license ($32,500). Pursuant to the terms of the May 8th agreement, Sweden was assigned the license, took possession of the Debtor's assets and began broadcasting on May 10, 1984.

The agreement of May 8th was reduced to writing in early June and signed by Defendants Powers and Mance. Defendant John Scura was named escrow agent. On June 8th the required funds were deposited with him. The writing contemplated that the contract price would be paid in full upon a tender of good title to the Debtor's assets within six months. If the Debtor failed to perform within the time prescribed, Sweden could apply the escrow to clear title, or reassign the broadcast license to the Debtor and reacquire the escrow.

Several days after the escrow agreement was put in writing Defendant Mance requested return of the deposit from Defendant Scura and the latter complied. After reacquiring the escrowed funds, Sweden attempted to reassign the broadcast license to the Debtor. Defendant Powers refused the reassignment, thinking it to be prohibited by an FCC regulation requiring the recipient of a license to possess sufficient capital to sustain operations for three months. The license was ultimately sold by Sweden to Defendant Altair Communications Inc., and its President, Defendant Gary Livingston.

On January 25, 1985, the case was converted to Chapter 7. The Trustee commenced this adversary proceeding on April 11, 1986, alleging that by prematurely cancelling the escrow agreement and disabling the Debtor from executing the sales contract, Defendants Sweden, Mance and Wamp deprived the estate of proceeds from the transfer of the broadcast license. Further, the Trustee asserts that Defendant Scura is liable to the Debtor for breaching his duty as escrow agent and prematurely releasing the escrowed funds. Finally, Defendant Powers is alleged liable for allowing the broadcast license, now valueless to the estate, to be transferred without Court approval. Defendants Altair Communications Inc., and Gary Livingston reached a settlement with the Trustee and have been released from liability in this lawsuit.

■ Under 11 U.S.C. § 1107, Four Score Broadcasting remained in business as a debtor-in-possession during the pendency of the Chapter 11 proceeding. As a debtor-in-possession, the Debtor stood in the shoes of a Trustee, H.R.Rep. No. 595, 95th Cong., 1st Sess. 404 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 116 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787, and was dutybound to perform as a fiduciary. Among the fiduciary responsibilities of the Debtor was preserving estate assets for the benefit of creditors.

■ Defendant Powers was President of the Debtor during the Chapter 11 proceeding. As President, he was charged with executing the Debtor's fiduciary obligations. *Wolf v. Weinstein,* 372 U.S. 633, 649, 650, 83 S.Ct. 969, 979–80, 10 L.Ed.2d 33 (1963). In executing those obligations, he was charged with exercising the degree of care that a person of ordinary intelligence and prudence would exercise. *In re Roblin Industries, Inc.,* 52 B.R. 241 (Bkrtcy.W.D.N.Y.1985); *See also* 9 Am Jur 2d, Bankruptcy § 154. The question raised regarding Defendant Powers is whether he endeavored to preserve the value of the broadcast license in an ordinarily prudent manner.

■ At the cutset, we dismiss the Trustee's assertion that Defendant Powers should be held to a standard of conduct more stringent than ordinary prudence. Defendant Powers is an attorney admitted to practice law in the District of Columbia. His area of legal expertise is in the field of labor law, not bankruptcy. He became involved in the Debtor's affairs as an investor. He assumed a leading role during the Chapter 11 proceeding not because of his legal background, but because his investment was at risk. Defendant Powers acknowledged his deficiency in the intricacies of bankruptcy practice by hiring veteran counsel to represent the Debtor throughout the reorganization proceeding.

■ During the pendency of the case the broadcast enterprise was diagnosed by Defendant Powers as terminal, and a decision to liquidate the Debtor's assets was made. Accordingly, he authorized the Debtor's bankruptcy counsel, Robert Feldman, to negotiate a sales contract with the only prospective purchaser that had come forward. Counsel prepared a contract, negotiated modifications thereof, acquired necessary signatures and presented it to the Court for approval. In other words, authority in all matters respecting the sale was delegated by Defendant Powers to Attorney Feldman.

Upon receiving the Court's oral approval for the sale, Attorney Feldman proceeded to take the steps he thought necessary to complete the transaction, advising Defendant Powers each step of the way. Relying upon counsel's advice in May and June of 1984, Defendant Powers made a provisional

transfer of the Debtor's assets to Sweden, taking back part of the purchase price in escrow. His reliance upon counsel's advice was neither misguided nor lacking in prudence. He had selected seasoned bankruptcy counsel to structure the transaction in the first instance, and relied upon counsel to fashion an *ad hoc* remedy to save the deal when it began to founder. Despite being an attorney, Defendant Powers was not charged with discovering whether a written Order existed authorizing the sale, and did not need to ascertain whether the escrow arrangement was a permissible means of performing the contract. By acquiescing in the terms of the escrow agreement Defendant Powers temporarily salvaged the contract and provided the estate with a sizable security at a time when the transaction was near collapse. Accordingly, the Court concludes that Defendant Powers, who at all times relied upon the advice of counsel, acted in an ordinarily prudent manner and did not breach his obligation to preserve the value of · the broadcast license. *See also* N.Y.Bus. Corp.Law § 715(h)(2) (Consol.1983).

■ Defendants Sweden, Mance and Wamp ("the Defendants") are alleged by the Trustee to have breached their contract with the Debtor, occasioning loss to the estate in the amount of the escrow deposit. The Trustee argues that the Defendants cancelled the escrow agreement prematurely, retrieved their deposit and terminated the contract before the Debtor could perform. The Defendants respond that they were within their rights to cancel the escrow agreement and terminate the contract since the Debtor had failed to perform by May 31, 1984.

As discussed above, the contract originally identified April 30, 1984, as the deadline for performance. However, when it became apparent that the transaction could not be completed by that date the parties moved the deadline forward to May 31, 1984. That date was chosen knowingly by the Defendants because it coincided with the termination of their purchase money financing commitment. (Transcript pp. 131–132). After the closing deadline was

moved to May 31st, however, the parties discovered that the transaction would be delayed longer still. They then negotiated the escrow agreement which, the Defendants concede, was designed to extend by six months the time within which the contract could be performed. (Transcript p. 75).

The May 31st deadline was an express condition which the parties placed on their respective performances under the contract. The Defendants could have strictly enforced that condition. However, by assenting to the terms of the escrow agreement, the Defendants waived their right to enforce the May 31st deadline, and bound themselves to the six month extension. On analagous facts, the New York Court of Appeals has taken the view that "[t]he conduct of the parties, while [ ] delay continues, may be such as to indicate a purpose to keep the contract alive; and such a purpose, once manifested, may not suddenly be abandoned." *Brede v. Rosedale Terrace Co.*, 216 N.Y. 246, 249, 110 N.E. 430 (1915) (Cardozo, J.). Here, as in *Brede*, the parties manifested conduct evidencing a clear intent to keep their contract viable beyond the May 31st deadline.

The Defendants next argue that the escrow agreement was the product of mistake, and their cancellation of it was justifiable therefor. The Defendants represented that the financing commitment deadline (May 31st) had slipped their minds when they negotiated the escrow agreement in early May. (Transcript p. 13). Had they realized the impending lapse of their financing commitment, the Defendants assert that they would not have extended the life of the contract. This assertion is belied, however, by the fact that the financing commitment deadline was weighing heavily on their minds when, only weeks earlier, they agreed to push forward the contract deadline from April 30th to May 31st. (Transcript pp. 131–132). The Court concludes that Defendants Mance and Wamp knew, or should have known, that their financing commitment would expire during the pendency of the escrow agreement, but proceeded anyway. Knowing what they did, and having the Debtor's

license and other assets transferred to them, the Defendants cannot now resurrect the May 31st contract deadline by crying mistake.

Finally, the Defendants argue that even if the escrow agreement had not been cancelled, neither they nor the Debtor could have performed within the six months provided. The Court does not agree with this theory of impossibility. Uncontroverted testimony was given that the Debtor believed itself capable of transferring good title during the six month extension period. (Transcript p. 111). Further, the Defendants' assertion that they would have been incapable of performing during the extension term is without sufficient basis.

It is clear that the Defendants' financier was unwilling to extend its commitment beyond May 31st because a prospective investor had withdrawn his support from the enterprise and would not guarantee Sweden's purchase money obligation. It is equally clear, however, that the Defendants made no attempt to acquire alternate financing or a replacement investor after June 8th. (Transcript pp. 81–82, 86–87). They concluded themselves to be incapable of performing and terminated the contract at a time when there remained five months within which to perform. By failing to diligently pursue their own performance and by thwarting the Debtor's performance, the Defendants placed themselves in breach. Their breach resulted in the Debtor being damaged in the amount of the escrowed funds that the Defendants prematurely retrieved.

■ Defendant John Scura was the escrow agent. He drafted the escrow agreement and was familiar with its terms. He also was the attorney for Defendants Sweden, Mance and Wamp. On June 11th, after Defendants Mance and Wamp concluded that they could not complete the deal, but five months before the term of the escrow was to expire, Defendant Scura released their deposit to them. "An escrow agent or depositary is charged with the duty not to deliver the escrow deposit to anyone except upon strict compliance with the conditions imposed, and he is subject to damages for a wrongful delivery unless the conditions are waived." 55 N.Y.

Jur.2d Escrows § 21 (citations omitted); *Farago v. Burke,* 262 N.Y. 229, 233, 186 N.E. 683 (1933). Here, the Debtor did not consent to an early termination of the escrow agreement. (Transcript p. 108). Accordingly, Defendant Scura breached his duty as escrow agent by prematurely releasing the funds on deposit.

To summarize, the Court concludes that Defendant Powers did not breach his fiduciary obligation to the Debtor and is not liable to the estate for the value of the broadcast license. Defendants Sweden, Mance and Wamp breached their contract with the Debtor and are liable to the estate for the value ($32,500) of the broadcast license. Defendant Scura breached his duty as escrow agent and is liable to the estate in the amount of the funds ($32,500) wrongly released. The judgments to be entered against Defendants Sweden, Mance, Wamp and Scura should be reduced by Ten Thousand Dollars ($10,000), the amount received by the Trustee in settlement of claims against Defendants released from liability in this lawsuit and it is so ordered.