**In re IONOSPHERE CLUBS, INC., and Eastern Air Lines, Inc., Debtors.**

**Bankruptcy Nos. 89 B 10448 (BRL), 89 B 10449 (BRL).**

United States Bankruptcy Court, S.D. New York.

April 19, 1990.

See also, Bkrtcy., 112 B.R. 78.

Weil, Gotshal & Manges, New York City by Bruce R. Zirinsky, Zack A. Clement, Deryck A. Palmer, Sharon Youdelman, Laura M. Sillins, Brian S. Rosen, for debtors.

Kramer, Levin, Nessen, Kamin & Frankel, New York City by Joel B. Zweibel, Adam Harris, for Creditors Committee.

Dickstein Shapiro & Morin by Samuel Stern, Hazel, Thomas, Fiske, Weiner, Beckhorn & Hanes, P.C., Washington, D.C. by Stanley J. Samorajczyk, Robert M. Marino, for Examiner.

Hughes Hubbard & Reed, New York City by Robert J. Sisk, for Texas Air Corp.

Cohen Weiss and Simon, New York City by Bruce H. Simon, Richard M. Seltzer, for ALPA.

Guerrieri, Edmond & James, P.C., Washington, D.C. by Joseph Guerrieri, Robert S. Clayman, for IAM.

O'Donnell & Schwartz, New York City by Carl Rachlin, for TWU.

Otto G. Obermaier, U.S. Atty., New York City by James Garrity, Jr., Asst. U.S. Atty., for Dept. of Transp.

Berlack, Israels & Liberman, New York City by Edward S. Weisfelner, David Strumwasser, for Preferred Shareholders Committee.

Carol Connor Flowe, Washington, D.C., Otterbourg, Steindler, Houston & Rosen, P.C., New York City by William M. Silverman, Enid Nagler Stuart, for Pension Ben. Guar. Corp.

Simpson Thatcher & Bartlett, New York City by Lillian E. Kraemer, for Airbus.

Zalkin, Rodin & Goodman, New York City by Henry L. Goodman, for Boeing Co.

Anderson Russell Kill & Olick, P.C., New York City by Roy Babitt, for Ad Hoc Committee of Bondholders.

Rogers & Wells, New York City by Richard S. Miller, for IBJ Schroder Bank & Trust Co.

Shanley & Fisher, P.C., New York City by Robert K. Malone, for Midlantic Nat. Bank.

Bruce H. Roswick, New York City, for First Fidelity Bank, N.A. as Collateral Trustee.

Gibson, Dunn & Crutcher, New York City by Peter C. Rockwell, for Nat. Westminster Bank, N.J. as Series A Trustee.

Clapp & Eisenberg, P.C., Newark, N.J. by Karen L. Gilman, for United Jersey Bank as Trustee Second Series Indenture.

Richard K. Helman, New York City, for The Port Authority of NY & NJ.

Riker, Danzig, Scherer & Hyland & Perretti, Morristown, N.J. by Rafel Perez, for First Fidelity Bank N.A. as Collateral Trustee.

Dow, Lohnes & Albertson, Washington, D.C. by David F. Bantleon, for Maryland Nat. Bank.

David I. Shapiro, Examiner.

Harold D. Jones, U.S. Trustee.

## RULING ON MOTION BY CREDITORS' COMMITTEE FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

BURTON R. LIFLAND, Chief Judge.

### BACKGROUND

On March 9, 1989 (the "Filing Date") Eastern Air Lines, Inc. and its affiliate Ionosphere Clubs, Inc. (the "Debtors" or "Eastern") each filed a voluntary petition for relief under chapter 11, title 11, United States Code (the "Code"). By order dated March 9, 1989, the cases were consolidated for procedural purposes only. Since the Filing Date, the Debtors have continued to operate their businesses as debtors-in-possession pursuant to Code §§ 1107 and 1108.

Approximately, 13 months after the Filing Date, the Official Committee of Unsecured Creditors of Eastern (the "Committee"), pursuant to Code § 1104, has moved this Court to appoint a Chapter 11 trustee to replace the debtor-in-possession, in order "to enhance the value of the estate" and proceed toward a "viable reorganization". Prior to this time, the Committee has had a very cooperative relationship with the Debtors. For example, on at least two separate occasions, in July 1989 and February 1990, the Committee authorized the issuance of press releases in support of the Debtors' management. In addition, the Debtors have obtained the use of $320 million of escrowed unencumbered cash since the Filing Date without objection from the Committee. Moreover, since the Filing Date, the Committee has also supported the Debtors' asset disposition program, proceeds of which have been used to fund Eastern's massive losses totaling over $1.2 billion.

At the end of March, the Committee lost all confidence in Eastern's management when Eastern announced to the Committee that it once again would have to renege on its previous agreement entered into six weeks earlier, and embodied in what has been referred to as the "Fifty–Cent" plan. Eastern reported to the Committee that its previous forecast had to be modified and that its losses in 1990 were now being estimated at $329.7 million, which is $184.4 million more than the $145.3 million that had been forecast in January. The Committee responded to Eastern's new assessment by demanding that Texas Air Corp. ("Texas Air"), as Eastern's parent, indemnify on a subordinated basis the continuing staggering losses of Eastern. It was only after Texas Air failed to guarantee such an indemnification that the Committee filed its motion to appoint a trustee.

The Committee asserts in its motion that a trustee is warranted in this instance because, *inter alia,* (1) Eastern's devastating, constantly expanding and unending losses are extremely damaging to unsecured creditors and therefore to the interests of the estate; (2) Texas Air and Eastern have demonstrated their inability to project the results of operations to the extent that the Committee has lost confidence in their stewardship of the business; and (3) Eastern and Texas Air have repeatedly reneged on their plan of reorganization agreements with the Committee, such that the Committee has no confidence in the ability or willingness of the Debtors and its common

equity holder to adhere to basic understandings.

It should be noted that the Committee's motion differs from the motion for the appointment of a trustee filed by the Air Line Pilot's Association ("ALPA") several days after the commencement of this case. The ALPA motion was based on alleged pre-petition activity of the Debtors. In April 1989, this Court appointed an Examiner to investigate these allegations, and deferred consideration of ALPA's motion pending the report of the Examiner. On March 1, 1990, after an extensive investigation spanning the course of approximately eight months, the Examiner filed his report regarding the pre-petition transactions between the Debtors and Texas Air and its affiliates. The Examiner concluded that with respect to 12 of the 15 transactions reviewed, sufficient facts existed to warrant the assertion of colorable causes of action on the grounds that such transactions constituted fraudulent conveyances. The report valued those causes of action at between $285 and $403 million. Although Eastern and Texas Air executed a Memorandum of Understanding with the Examiner to settle all claims arising out of the pre-petition transactions, Texas Air and Eastern have vehemently denied any wrongdoing. The Committee's motion, however, is not framed to include these pre-petition activities as grounds for the appointment of a trustee. Instead, the Committee, recognizing that the settlement of these pre-petition activities may no longer exist in view of the aborted 50% plan, also includes as a ground for the appointment of a trustee the need to pursue the claims against Texas Air and others.

## DISCUSSION

Chapter 11 of the Code is designed to allow the debtor-in-possession to retain management and control of the debtor's business operations unless a party in interest can prove that the appointment of a trustee is warranted. *In re General Oil Distributors, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y.1984); *In re BAJ Corp.*, 42 B.R. 595, 597 (Bankr.D.Conn.1984); *In re La Sherene, Inc.*, 3 B.R. 169, 174 (Bankr.N.D.

Ga.1980). The appointment of a trustee in a chapter 11 case is an extraordinary remedy. *In re William A. Smith Constr. Co., Inc.*, 77 B.R. 124, 126 (Bankr.N.D.Ohio 1987); *In re Parker Grande Development, Inc.*, 64 B.R. 557, 560 (Bankr.S.D.Ind.1986); *In re Anchorage Boat Sales, Inc.*, 2 C.B. C.2d 348, 361, 4 B.R. 635 (Bankr.E.D.N.Y. 1980). There is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee. *Committee of Dalkon Shield Claimants v. A.H. Robbins Co., Inc.*, 828 F.2d 239, 241 (4th Cir. 1987); *In re Evans*, 48 B.R. 46, 47 (Bankr. W.D.Tex.1985); *In re Eichorn*, 5 B.R. 755, 757 (Bankr.D.Mass.1980).

Section 1104(a) of the Code provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

Although in this case a full four day evidentiary hearing was conducted, in considering a motion for the appointment of a trustee, a bankruptcy court is not required to conduct a full evidentiary hearing. *In re Casco Bay Lines, Inc.*, 17 B.R. 946, 950 (1st Cir.B.A.P.1982). The party requesting the appointment of a trustee has the burden of proof in showing "cause". *See, In re William A. Smith Constr. Co., Inc.*, 77 B.R. at 126; *In re Cole*, 66 B.R. 75, 76 (Bankr.E.D.Pa.1986);

*In re St. Louis Globe–Democrat, Inc.,* 63 B.R. 131, 138 (Bankr.E.D.Mo.1985). The evidence supporting the motion for the appointment of a trustee must be clear and convincing. *Id.; In re Evans,* 48 B.R. at 47; *In re Tyler,* 18 B.R. 574, 577 (Bankr.S. D.Fla.1982).

■ The language of § 1104(a)(1) of the Code represents Congressional recognition that some degree of mismanagement exists in virtually every insolvency case. *In re Evans,* 48 B.R. at 47; *In re La Sherene, Inc.,* 3 B.R. at 174. The philosophy of chapter 11 is to give the debtor a "second chance" and, consistent with such philosophy, current management should be permitted to identify and correct its past mistakes. H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6179, 6180. While a certain amount of mismanagement of the debtor's affairs prior to the filing date may not be sufficient grounds for the appointment of a trustee, continuing mismanagement of the affairs of a debtor after the filing date is evidence of the need for the appointment of a trustee. *See, In re Colby Constr. Corp.,* 51 B.R. 113, 117 (Bankr.S. D.N.Y.1985); *In re McCorhill Pub., Inc.,* 73 B.R. 1013, 1017 (Bankr.S.D.N.Y.1987).

■ Code § 1104(a)(2) creates a flexible standard and allows the appointment of a trustee even when no "cause" exists. *In re Sharon Steel Corp.,* 871 F.2d 1217, 1226 (3rd Cir.1989); 124 Cong.Rec. H11,102 (daily ed. Sept. 28, 1978); S17,419 (daily ed. October 6, 1978). The House Report summarizes the reasons for Congress' adoption of a flexible standard for the appointment of trustees. The House Report, in part, reads as follows:

> The twin goals of the standard for the appointment of a trustee should be protection of the *public interest* and the interests of creditors, as contemplated in current chapter X and facilitation of a reorganization that will benefit both the creditors and the debtors, as contemplated in current chapter XI. Balancing the goals is a difficult process, and requires consideration of many factors.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 232 (1977), U.S.Code Cong. & Admin.News 1978, p. 6192 (emphasis added). Where the debtor's business effects such a large segment of the general public, consideration of the "public interest" becomes a greater factor in deciding whether to order the appointment of a trustee. In this case, as has clearly been articulated by this Court time and time again, the flying public's interest must at all times be taken into account.

■ With respect to whether a trustee should be appointed under Code § 1104(a)(2), courts "eschew rigid absolutes and look [ ] to the practical realities and necessities," *In re Hotel Associates, Inc.,* 3 B.R. 343, 345 (Bankr.E.D.Pa.1980). Among the factors considered are: (i) the trustworthiness of the debtor, *In re Evans,* 48 B.R. 46, 48 (Bankr.W.D.Tex.1985); (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation, *In re Parker Grande Development, Inc.,* 64 B.R. 557, 561 (Bankr.S.D. Ind.1986); *In re L.S. Good & Co.,* 8 B.R. 312, 315 (Bankr.N.D.W.Va.1980); (iii) the confidence—or lack thereof—of the business community and of creditors in present management, *In re Concord Coal Corp.,* 11 B.R. 552, 554 (Bankr.S.D.W.Va.1981); and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment, *In re Microwave Products of America, Inc.,* 102 B.R. 666, 675 (Bankr.W.D.Tenn.1989).

Throughout this case, Eastern has continually made operating projections which it has failed to achieve with the resultant losses being borne by the unsecured creditors. For instance, in Eastern's April 1989 Business Plan it was projected that Eastern would suffer operating losses of approximately $636.4 million for the period from April through December, 1989, but concluded that Eastern would become marginally profitable in 1990, and have substantial net income in 1991 and thereafter. The actual results and current projections are as follows:

(i) Losses from April 1989 through year end exceeded $865 million, more than

136% of the April Business Plan projections;

(ii) Losses from September 1989 through year end exceeded $400 million, more than 170% of the August Business Plan projections of $235.5 million;

(iii) Losses for 1990 are now projected to be $329.7 million, $184.4 million greater than the $145.3 million projected in the January Business Plan;

(iv) Losses for 1991 are projected to be not less than another $120 million; and

(v) Since the filing date, operating losses have amounted to more than $1.2 billion.

By admission of the Chairman of the Board, Frank Lorenzo, these losses have wiped out the parent Texas Air's equity.

Eastern has also come to a number of agreements with the Committee concerning potential plans of reorganization, but Eastern has been unable to meet the terms of such agreements. From the July 1989 plan which provided for the unsecured creditors to receive 100% of their claims plus post-petition interest, Eastern's most recent proposal now provides that unsecured creditors will receive only approximately 25% of their claims with most of the payments being spread over a number of years. An interim "Fifty–Cent" plan was considered. Thus each succeeding offer was one-half of the previous one.

The Debtors' inability to make reliable operating estimates, even over the shortest of time periods may be illustrated by the Debtors present quest to use $80 million of escrowed cash. For purposes of scheduling, on Friday April 6th, the Debtors contacted this Court and indicated the need for an emergency hearing for the transfusion of cash to be heard no later than April 12th. At the hearing on April 13th, the Debtors indicated in court that they could get by until sometime early this week. The Debtors now indicate that its cash needs are such that it can continue through the rest of the month without additional cash. At no time has it indicated what interim emergency amounts, if any, were necessary. During the hearing it developed that the emergency need was $14 million dollars for pension fund payments, but that due to

Texas Air's payment of that sum the immediate crisis had passed.

■ A debtor-in-possession must act as a "fiduciary of his creditors" to "protect and to conserve property in his possession for the benefit of creditors", and to "refrain [ ] from acting in a manner which could damage the estate, or hinder a successful reorganization of the business." *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr.W.D. Pa.1988). As the court in *Sharon Steel* observed, "the most common basis for appointing a trustee under § 1104(a)(1) is for gross mismanagement and incompetence." *Id.* at 458.

■ A debtor-in-possession has all the duties of a trustee in a Chapter 11 case, including the duty to protect and conserve property in its possession for the benefit of creditors. *In re Devers*, 759 F.2d 751, 754 (9th Cir.1985); *In re Four Score Broadcasting, Inc.*, 77 B.R. 404, 407 (Bankr.W.D. N.Y.1987). "The job of a debtor-in-possession remains under the Code as that described by Judge Friendly—to get the creditors paid." *In re Pied Piper Casuals, Inc.*, 40 B.R. 723, 727 (Bankr.S.D.N.Y.1984) (citing *In re Grayson Robinson Stores, Inc. v. Securities and Exchange Commission*, 320 F.2d 940 (2d Cir.1963)). A debtor-in-possession's fiduciary obligation to its creditors includes refraining from acting in a manner which could damage the estate, or hinder a successful reorganization of the business. *In re Thurmond*, 41 B.R. 464, 465 (Bankr.D.Or.1983). When a debtor-in-possession is incapable of performing these duties, a Chapter 11 trustee may be appointed. *In re McCorhill Publishing, Inc.*, 73 B.R. 1013, 1017 (Bankr.S.D.N.Y.1987).

In *In re Pied Piper Casuals, Inc.*, 40 B.R. 723 (Bankr.S.D.N.Y.1984), the court appointed a Chapter 7 trustee after making the following finding:

That is not to say that the debtor may never right its ship. But it is to say on the evidence presented such a possibility is not reasonably likely and, accordingly, the creditors should not be asked to bear the risk that the debtor's projections, al-

ready destroyed in March, April and May, will somehow occur.... *Id.* at 727.

In *In re Cardinal Industries, Inc.*, 109 B.R. 755 (Bankr.S.D.Ohio 1990), the creditors committee, in moving for the appointment of a trustee, cited the debtor's inaccurate financial forecasts, failure to stem cash losses of $1.6 million since the bankruptcy filing, conflicts of interest and improper prepetition transfers. Noting that "unsecured creditors are being asked to wait five to ten years" for the debtors to generate income for distribution, and that creditors had "lost faith in the Debtors' intentions and abilities to reorganize their affairs," the court held that the failure to appoint a trustee would "jeopardize whatever chance exists to realize the potential value of these estates." The court went on to hold that "since the [unsecured creditors] are willing to risk the costs, uncertainties and dislocations, occasioned by the appointment of a trustee, the Court will exercise its equitable powers to order that appointment." *In re Cardinal Industries, Inc.*, 109 B.R. at 767.

Similarly in this case, based upon the papers filed, the testimony adduced over the last four days and all the exhibits admitted into evidence, this Court finds by clear and convincing evidence that the appointment of an operating trustee is warranted under these circumstances pursuant to both § 1104(a)(1) and especially (a)(2) of the Code. The Debtors' inability to formulate a business plan and make operating projections which have a longevity of more than several months, along with the continuing enormous operating losses being sustained by the estate, mandate that this Court order the appointment of a trustee "for cause, including ... incompetence" under Code § 1104(a)(1). Moreover, pursuant to § 1104(a)(2) of the Code, the appointment of a trustee "is in the interest of creditors, ... [and] other interests of the estate." It is undisputed that Texas Air no longer has any equity interest in Eastern. Consequently, the airline, in a sense, is now owned by its creditors who cannot be forced to subsidize a debtor-in-possession forever. In this instance, with Mr. Lorenzo

at the throttle, or hovering over it, Eastern has used $1.2 billion to "fuel" this reorganization trip. The time has come to replace the pilot to captain Eastern's crew.

In opposition to the Committee's motion to appoint a trustee, the Debtors argue that the huge losses and missed projections were caused not by management errors, but because of unexpected cost increases and a general downturn in the airline industry. The Debtors also assert that even experts in the airline industry missed their projections during this time period. The Debtors' contentions, however, are unpersuasive. Irrespective of fault, the magnitude of the Debtors' losses together with the Debtors' inability to make reliable forecasts, even over a short period of time, supports a finding that Eastern's owner manager, as personified by the Chairman of the Board of both the parent and the Debtor, is not competent to reorganize this estate.

In addition, a substantial part of the Debtors' defense has revolved around its assertions that this is an extraordinary bankruptcy case and that Eastern's management has had to rebuild operations in the most adverse of circumstances in the context of an intense labor conflict. Indeed, this has been an extraordinary bankruptcy case in that the Committee has supported these Debtors for 13 months in hopes that they would be able to turn things around. However, $1.2 billion later, this has not occurred. Although it is undisputed that Texas Air's interest as equity holder has been wiped out, Texas Air as Eastern's parent has been unwilling or perhaps unable to *adequately* support these struggling Debtors through their stormy course in chapter 11. This is suggestive of parental neglect. Texas Air is now risking unsecured creditors' funds. Thus, in light of the history of this case in which Eastern and Texas Air have again demonstrated insufficient stability and resolve in keeping to its promises and "agreements" with the Committee, the Committee's resolution that "it has no more to give" is fully justified. If Texas Air is no longer willing or cannot put up adequate risk money to support

Eastern, it cannot expect the unsecured creditors to continually fund and endure the perpetually mounting losses.

Additionally, Eastern contends that its ability to rebuild operations and attract passengers has been adversely affected by the negative publicity from "leaks" coming from the Committee and from the Preferred Shareholders Committee "liquidation" analysis in response to one of Eastern's 1990 requests for use of escrowed unencumbered cash. The evidence does suggest that there is a correlation between the negative publicity and the ability of the Debtors to attract additional passengers. However, the Debtors cannot shift the blame for these huge losses which have been generated over the past 13 months. Indeed, these losses standing alone are a source of negative publicity. As stated by Eastern's own counsel, "the ultimate responsibly lies with management."

The Debtors also argue that the Committee's motion is actually a disguised attempt to have the Eastern estate liquidated, or in the alternative, that the appointment of a trustee would effectively lead to the liquidation of the debtor. However, the motivation of the Committee in bringing on its motion is not relevant to a determination pursuant to § 1104(a) of the Code. Furthermore, as has been reiterated several times throughout this hearing, this Court has always considered that a trustee, if appointed, would be empowered, and indeed mandated, to operate and manage the airline as a going concern. The same mandate is strongly urged by the Committee. Likewise, the Debtors have not convinced this Court that a highly qualified airline executive with the authority to continue employment of a hands on management team would not be able to operate this airline more effectively and avoid liquidation than the current discretionally involved Chairman of the Board.

Further, the Debtors attempt to show that the appointment of a trustee would derail, or at least delay, the Department of Transportation's (the "DOT") approval of the Debtors' sale of Latin American routes to American Airlines is not compelling.

Comments on the record by the United States Attorney's office, speaking for the Department of Transportation, indicate that the appointment of a trustee, *per se*, will have no effect on their deliberations or on the expedited approval schedule which has been previously announced.

Another basis for change at this time can be found the DOT's finding in a 1988 report that the labor management discord, if not abated, could *ultimately* affect safety. It is clear that over the 13 month course of these proceedings that the labor strife or lack of labor accord exists and confrontation remains. While it is gratifying that the FAA has investigated and given assurances as to the continued safety of the airline, the 1988 DOT investigation conclusions with respect to the effects of unabated hostility should not be ignored. Under these circumstances, it would be inappropriate not to allow another manager to responsively address this problem.

If this Court were to deny the Committee's motion, the Committee has filed papers indicating that it will not support further use of escrowed unencumbered cash. Moreover, no other interest group will support the continued use of escrowed unencumbered cash without the appointment of a trustee. It is undisputed that without the further use of escrowed unencumbered cash, the estate will run short of operating funds. For this need alone, the interests of creditors, preferred shareholders, employees, and the flying public are better served by an order appointing an operating trustee.

This Court also finds in light of the statements made in open court and the exhibits entered into the record, that under the Employee Retirement Income Security Act of 1974, the appointment of a trustee does not effectuate a change in the continued existence of Eastern's controlled group which includes Texas Air and other of its subsidiaries, and therefore does not alter the liability of any member of the controlled group for contributions to, and employer liability arising from any termination of, Eastern's underfunded pension plans while a member of the controlled group.

172

## CONCLUSION

This Court finds that clear and convincing evidence has been presented which mandates ordering the appointment of a trustee under both Code §§ 1104(a)(1) and 1104(a)(2). Because the main concern of the trustee is to operate the airline, and since many of the functions of the trustee under Code § 1106 have already been performed, or are being performed currently, until a further order fully specifying the particular duties and responsibilities of all retained professionals is entered, each entity retained to perform services for the benefit of the estate should be authorized to continue supplying such professional services. Therefore it is

ORDERED that The Unites States Trustee is directed to appoint an eminently qualified person, with the ability to continue to operate the airline, as quickly as is practical and such person is charged with operating Eastern Airlines as a going concern and exploring a viable business plan; and it is further

ORDERED that to minimize disruption, dislocation, and an irreversible dip into chaos, all professionals previously retained pursuant to Code § 327(a)–(d) shall remain retained by the estate subject to further order of this Court, and to the extent special authorization is required, it is accomplished pursuant to Code § 327(e), with the mandate to such professionals to continue providing all services including legal services as such are necessary and essential to the estate; and it is further

ORDERED that because the Examiner's duties as specified in the order appointing him have not yet been concluded, except for the filing of his report, his continued service as Special Advisor to perform the other functions as detailed in the order appointing him pursuant to Code § 1106 shall continue until further order of this Court; and it is further

ORDERED that the trustee is hereby authorized to use up to $80 million of the escrowed unencumbered cash.

The foregoing ruling is subject to modification in accordance with the needs of the estate.