### In re COLORADO–UTE ELECTRIC ASSOCIATION, INC., Debtor.

**Bankruptcy No. 90 B 03761 C.**

United States Bankruptcy Court, D. Colorado.

Aug. 3, 1990.

As Amended Nov. 5, 1990.

Paul D. Rubner, Denver, Colo., for Intermountain Rural Elec. Ass'n.

Stephen J. Shimshak, Nicholas M. De Feis, Wilbur F. Foster, New York, N.Y., Darrell G. Wass, Denver, Colo., for Nat. Rural Utilities Co-op. Finance Corp.

W. Michael Tupman, U.S. Dept. of Justice, Washington, D.C., for United States Rural Electrification Admin.

Edward T. Ramey, Denver, Colo., Robert L. Driscoll, Kansas City, Mo., for Debtor.

Fred L. Witsell, Denver, Colo., Ralph Mabey, Steven J. McCardell, Steven H. Davis,

Salt Lake City, Utah, for Public Service Co. of Colorado.

Leo M. Weiss, Denver, Colo., for U.S. Trustee.

## MEMORANDUM OPINION AND ORDER

PATRICIA A. CLARK, Bankruptcy Judge.

This matter is before the Court upon the motions for the appointment of a Chapter 11 trustee, or alternatively, an examiner with powers filed by the Intermountain Rural Electric Association (IREA), the National Rural Utilities Cooperative Finance Corporation (CFC) and the Rural Electrification Administration (REA). Empire Electric Association, Inc. filed a response in support of the motions. The Public Service Company of Colorado (PSCo) filed a statement in support of the motions.[1]

The debtor and the Unsecured Creditors' Committee (Committee) filed objections to the motions. There were also objections to the motions filed by Platte River Power Authority and Salt River Project Agricultural Improvement and Power District. Two days before the hearing, several cooperative members, San Luis Valley Rural Electric Cooperative, Inc., Gunnison County Electric Association, Inc., and Sangre de Cristo Electric Association, Inc., filed a position statement in opposition to the motions.[2] The United States Trustee filed a limited objection to the motions.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. It is a core proceeding.

First, the Court will review the general background of Colorado–Ute, its association with its cooperative members, the board of directors and the current management. Then, the Court will examine the germane events which precipitated the filing of the petition for relief. Finally, the

---

1. PSCo was allowed to fully participate in the hearing. It has been an active participant in this case and is listed as an unsecured claimant for approximately $31 million.

2. Thus far, those parties had not been active participants in the proceedings and to avoid undue complication in the hearing, they were not allowed to fully participate, however the Court reviewed and considered their position statement in deciding this matter.

Court will review additional relevant facts related to this motion.

On March 30, 1990 Colorado–Ute filed its petition for Chapter 11 relief. It is a privately-owned non-profit electric association. It is primarily engaged in the business of generating and transmitting electric energy for wholesale distribution to its fourteen rural electric cooperative members (co-op members). It provides service in 49 of the state's 63 counties. It employs approximately 740 people.

Colorado–Ute's generation facilities consist of five coal-fired power plants (one of which is leased, Craig 3) and three hydroelectric plants. It has one experimental station in Nucla which is powered by circulating fluidized-bed combustion, that station will be on-line by the end of the year.

Colorado–Ute's co-op members are consumer-owned non-profit electric associations. The co-op members supply electrical energy to their retail customers through bulk purchases of power and energy from Colorado–Ute. The co-op members have all-requirements contracts with Colorado Ute to purchase all of their power from the utility through December 31, 2025. Colorado–Ute's wholesale load (demand) projections are based in large part upon the retail load projections of its members.

A brief review of Colorado Ute's financial situation is illuminating. On its statements and schedules Colorado–Ute lists a total of $1,165,049,897 in assets and $1,844,120,818 in liabilities. Its two secured creditors are the REA and CFC. The total secured debt owed to them is approximately $727,500,000. According to Colorado–Ute's revised operating budget, in 1988 the debtor suffered a net loss of $24,229,-461; in 1989 the net loss was 103,519,258; and the projected net loss for 1990 is $38,-296,800.[3]

The following facts are illustrative of the relationship between Colorado–Ute and its co-op members. In the late fall of 1989, two of the co-op members commenced legal actions against Colorado–Ute. The first action was filed by IREA in the District Court of Douglas County. Among other things, the complaint alleged that Colorado–Ute, through its management and board, breached its fiduciary duty, good faith and due care owed to IREA by not keeping its rates competitive. The second action was filed by IREA and Delta–Montrose Electric Association in the District Court for Delta County. That complaint sought the immediate appointment of a receiver for Colorado–Ute.

Not all of the co-op members paid their power bills over the past year. According to the debtor's schedules, six of the co-op members had not paid their full monthly bills for power received, but offset their debt for various reasons. These offsets total approximately, $9,922,842.

Colorado–Ute recently commenced litigation to recover the offsets. Two complaints to recover those offsets were filed in February of 1990 and others were filed in May of 1990.[4] The complaints resulted in substantial payments from at least one co-op member.

At present, five co-op members have expressed a desire to explore their options in seeking another wholesale power supplier. Those members are: IREA, Holy Cross Electric Association, Yampa Valley Electric Association, Empire Electric Association, Inc., and Grand Valley Rural Power Lines, Inc. The combined load of these members is approximately 50% or more of Colorado–Ute wholesale power sales.

There is a division among the co-op members on the issue of whether a trustee or an examiner should be appointed. Three of the co-op members oppose the motion, they are: San Luis Valley Rural Electric Cooperative; Sangre De Cristo Electric Associa-

---

**3.** Those figures incorporate depreciation, amortization, tax and interest expenses, and non-operating income and expenses.

**4.** In response to the lawsuits to recover the offsets, the board of directors of San Luis Valley resolved that "it is not in the best interest of either its member distribution cooperative or Colorado–Ute Electric Association, Inc. for Colorado–Ute Electric Association, Inc. to file a lawsuit against its member owned distribution cooperatives." The resolution continued stating that Colorado–Ute should "terminate any lawsuits against distribution cooperatives currently in progress."

tion; and Gunnison County Electric Association. Two of the co-op members support the motion, they are: IREA and Empire Electric.

The business and affairs of Colorado–Ute are managed by a board of directors consisting of one director nominated by the board of directors of each member cooperative and elected by Colorado–Ute's membership at the company's annual meeting.[5] The board meets on a monthly basis and otherwise as required. The board also has standing committees. Other special committees are formed as needed. All but two members of the board have been on the board since 1985.

The co-op member managers are allowed to attend the Colorado–Ute board meetings and participate in discussions, but cannot vote. Member managers may serve as members of committees and vote on those committees.

The board has undergone a recent change in leadership. On May 10, 1990, Joe deGanahl, then chairman of the Colorado–Ute board, who is also a member of the board of Yampa Valley, and Tom Turnbull, then vice-chairman of the Board, who is a member of the board of Holy Cross, resigned from the Colorado–Ute board. Apparently they were concerned about a conflict of interest due to their respective co-op board decisions to explore options of obtaining a new wholesale power supplier.

Gene Coleman became the chairman of the Colorado–Ute board in May of this year. He has been on the board of directors since 1977. He previously served as chairman of the board from 1983–1986. He belongs to the Sangre de Cristo Electrification Association. Mr. Coleman is a high school graduate and has attended yearly NRECA "schools" several days a year for the last fourteen years. Apparently, the "schools" offered training and seminars for directors of rural electric cooperatives. He is retired. Before retirement he was primarily engaged in a trucking business and he owned a shopping mall.

The new vice-chairman is Carmel Garlutzo. He has been on the board since 1983. He was elected to San Isabel Electric Association's board in 1975, and has been its president since 1983. Mr. Garlutzo is an attorney.

In the past, communication between the board and management was not ideal. Prior management did not keep the board of directors timely and fully advised of major financial problems. Testimony revealed that the current board and management are communicating and working together in an improved manner.

After a management-audit review in the fall of 1989, Colorado–Ute revised its management and management structure. The pertinent management positions of Colorado–Ute are now held by Raymond Keith as president and chief executive officer,[6] and Gerald Johnston holds the recently created position of chief financial officer.

Mr. Keith was employed by Colorado–Ute for approximately fourteen years before he was elected president effective December 15, 1989. He holds a Masters degree in electrical engineering and is a registered professional engineer in the state of Colorado. Prior to his election, he held various middle-management positions and the largest number of people that he supervised was fifteen. Before his election, the largest contract with an outside party that he engaged was approximately $50,000. Previously, he had never hired investment bankers or outside counsel. According to his testimony, he did not aspire to be president, nor did he expect to hold that position.

Mr. Keith was involved in the selection of the chief financial officer Mr. Johnston. Approximately sixteen candidates were interviewed for the position. Only two, (one of which was Mr. Johnston) of the sixteen were interviewed by Mr. Keith.[7] Mr. Keith highlighted some of the reasons why Mr.

---

**5.** Until recently the board consisted of twenty-eight voting members.

**6.** There have been four different chief executive officers since 1988.

**7.** Colorado–Ute did not advertize to solicit candidates for the chief financial officer position. Instead, it used an electric utility service organization and word of mouth to assist it in finding qualified candidates.

Johnston was selected. He noted that Mr. Johnston was independent of the utility industry taint and could provide a fresh approach. He also believed that Johnston's experience with work-outs would be helpful. Mr. Keith was not certain of Mr. Johnson's expertise in hiring outside professionals.

Mr. Johnston was hired by Colorado–Ute in January of 1990. He holds a Bachelor of Science degree in business administration and has taken courses toward a master's degree in that field. His reorganization and work-out experience came from his position as treasurer of the Petro–Lewis Corporation from 1982–1986. In particular, he has some experience working with investment bankers and greater experience in loan workouts with banks. He interviewed one potential bankruptcy attorney, but has no other previous relevant experience in hiring bankruptcy counsel or investment bankers. Prior to Mr. Johnston's employment with Colorado–Ute, he had not worked for an electric utility and did not have experience in utility accounting.

Since his arrival at Colorado–Ute, Mr. Johnston has attempted to establish financial planning and reporting requirements for both the short- and long-term. He has also consolidated all of the finance, accounting and financial forecasting functions of the company into his division. Although Colorado–Ute offered a seminar on reading generation and transmission accounting statements, Mr. Johnston did not attend.

As for the germane events which precipitated this petition, the Court finds the following facts related to expansion and rates to be relevant. The parties agree that one of the debtor's greatest handicaps is that it overbuilt based upon anticipated growth on the Western Slope. In 1980 [8] Colorado–Ute completed a power requirement study, based in part upon studies completed by the co-op members. Other studies were done by Public Utilities Commission (PUC) which forecasted that there would be an 11.9% increase in energy usage. Relying upon these different studies, Colorado–Ute proceeded with the development of the Craig 3 facility in an effort to

8. This study was updated in 1982.

meet anticipated needs. Contrary to the projections, growth in member sales has been approximately 7% less than anticipated due to the economic difficulties on the Western Slope. Many of Colorado–Ute's economic problems have their genesis from the cost incurred in connection with the decision to expand the generation and transmission facilities.

Also, in 1983 Colorado–Ute decided to retrofit the Nucla Station. The project has cost more than expected and the increased capacity currently does not appear to be needed.

In 1986, Colorado–Ute decided to reduce its rates by approximately 5% in an effort to stimulate sufficient demand to offset losses. In retrospect, the parties agree that decision was not wise. Although the reduction did bring about two new load customers, one of which is the City of Glenwood Springs, the demand was not sufficient to offset losses.

In response to the rate decrease, the REA notified Colorado–Ute that it did not approve of the decrease because Colorado–Ute probably would not be able to make its TIER payments (Times Interest Earnings Ratio) required by the mortgage with REA. That ratio requires coverage of at least 1.05% of the debt service each fiscal year. Colorado–Ute did not meet the ratios in 1987 through 1989.

In 1989, in an effort to increase revenue, the board of directors resolved to raise the rates charged by Colorado–Ute. In May of 1989, the Board authorized a rate increase of 8%, effective July 1, 1989. Then, in October of 1989, Colorado–Ute authorized a rate increase of an additional 14.5% to become effective on December 2, 1989.

The PUC investigated the reasonableness of the rates with respect to the May 8% increase, but it also looked at the October request although that was not officially before it. In PUC Decision No. C89–1538 (November 30, 1989), the PUC approved a 14.5% increase in rates.

A March 21, 1990 PUC decision officially reviewed the October requested increase. The PUC determined that a total increase of 8% over the pre-July 1, 1989 rates was the just and reasonable rate.[9] The PUC based its decisions in part upon the "used and useful" rationale determining that rates could not be raised just to meet merger terms with Tri–State and that the solution to Colorado–Ute's financial problems could not come from rate increases alone. In sum, it concluded that the financial problems of Colorado–Ute could not be resolved on the backs of its ratepayers.

The PUC also noted that unfortunately the key parties had taken a "not me" approach to aiding Colorado–Ute through its distressed financial position. The PUC pointed out that Colorado–Ute's own distribution members were not willing to consider possible cash infusions;[10] and the major secured creditors were not willing to renegotiate any reductions in the level of debt.

Notwithstanding the decisions of the PUC, on March 26, 1990, the REA directed Colorado–Ute to raise rates. The PUC filed suit in the United States District Court seeking a declaratory judgment on the issue of whether the PUC rate determinations are preempted by the REA.

Additional relevant events which prompted this petition involved the default on the REA and CFC loans, the filing of an involuntary bankruptcy petition, and the failure to complete a merger or asset sale.

The events which immediately precipitated the REA and CFC default took place in March of 1989. In early March of 1989 First Interstate Bank declared a material adverse change under its letter agreement with Colorado–Ute. A short time thereafter, Colorado–Ute paid First Interstate Bank approximately $10 million dollars on the unsecured obligation.

That same month, Colorado–Ute requested a renewal of its credit line with CFC in the amount of $40 million and consideration of an extension of that amount to $120 million. CFC refused to renew or extend either amount. However, Colorado–Ute did receive a $1.2 million loan advance from CFC.

Colorado–Ute subsequently defaulted on its secured and unsecured payments. Colorado–Ute failed to make $12.5 million in debt service payments to CFC and REA. It also defaulted on interest payments to its three remaining unsecured bank lenders.

After attempts at a workout failed, three of Colorado–Ute's largest unsecured creditors filed an involuntary petition with the United States Bankruptcy Court for the District of Colorado on June 5, 1989. Colorado–Ute did not contest the petition.

On July 12, 1989, the debtor, the petitioning banks, and other creditors, including CFC and REA, executed a "Standstill Agreement." That Agreement required the debtor to pay interest to its creditors through May 1, 1990, but no principal on any of its debts, other than repayment of the original March 1989 default amounts to REA and CFC. Subject to the terms of the Agreement, the creditors agreed not to exercise any remedies arising as a result of the debtor's default under the relevant loan documents. The Agreement was approved and the case was dismissed on August 16, 1989.

During the standstill period and before this bankruptcy case was filed, Colorado–Ute was approached with several proposals to restructure itself, plus it developed its own stand-alone alternative. The first offer involved a proposed power capacity purchase by a group of utilities led by Tri–State Generation and Transmission Association (Tri–State). The second involved a proposed asset purchase by PSCo, said proposal was later withdrawn. The third involved a proposed merger between Colorado–Ute and Tri–State. The stand-alone alternative involved the sale of its excess generating capacity so that the cash from

---

9. Due to the 5% rate decrease in 1986, this decision resulted in Colorado–Ute being allowed to increase rates only 3% (approximately) above the rates which it charged in 1982.

10. Three of Colorado–Ute's co-op members (Delta–Montrose, IREA, and Southeast Colorado) opposed the rate increase, and lobbied in favor of rolling back the rates.

the sale and the decrease in operating expense related to that capacity would permit Colorado–Ute to work out its financial problems by itself.

Of the proposals from third parties, the suggested merger with Tri–State progressed the farthest prior Colorado–Ute's bankruptcy. On October 27, 1989, Tri–State and Colorado Ute executed a letter of intent which required exclusivity in discussions and negotiations of a merger. The exclusive right would last until the termination of the letter of intent. During the negotiations, Tri–State had extended to Colorado–Ute a revolving line of credit of up to $40 million. Following the March 1990 ruling of the PUC declining approval of the additional 14.5% rate increase, Tri–State announced its intention to withdraw the letter of intent and it withdrew the line of credit.

Additional facts relevant to this motion concern the employment of professionals, the transfer of $20 million immediately prior to filing the bankruptcy petition, and renegotiation of a requirements contract with Colowyo Coal Corporation.

Over the past year, Colorado–Ute has hired a myriad of professionals to advise it with respect to restructuring management, accounting and operations and to reorganization. As of December 31, 1989, it had paid approximately $2,528,554 for professional services related to the workout plan.

Of particular interest are the amounts paid to Smith, Barney, Harris, Upham and Co., Inc. (Smith–Barney) and to Stone & Webster.

Approximately $953,970 was paid to Smith–Barney for investment banking advice. Messrs. Keith and Coleman note that Smith–Barney provided Colorado–Ute with important information. However, Messrs. Keith and Johnson believe that Smith–Barney was overpaid for the work that they did, however, no action has been take to recover any of the money and they have "suspended" their contract with Smith–Barney. It is notable that Mr. Coleman had never reviewed any of the information provided, was unaware of how much Smith–Barney had been paid and thought that Smith–Barney had completed its work for Colorado–Ute.

Stone & Webster was paid $113,201 for merger feasibility studies. Mr. Coleman initially had difficulty remembering who Stone & Webster was and what they did for Colorado–Ute, however after his recollection was refreshed, he recalled that he was not satisfied with their work because of their valuation of the company.[11]

Colorado–Ute paid $25,127 to Coopers & Lybrand for a management audit. Coopers & Lybrand made a number of recommendations to restructure the management and financial organization of Colorado–Ute.[12]

---

**11.** Although Mr. Coleman did not have an opinion as to the value of Colorado–Ute during his deposition, he did have an opinion on the following day at the hearing. He noted,

> I have an opinion of the value, but I think we need expertise help in making a sale of assets is why we wanted to hire Salomon Brothers to help us evaluate the property, help us to have an opinion rather than our own in case we made a sale and would someone come back and say, "Well, look, this is just your opinion. There's no professional opinion there. We want a professional opinion as the value of the property," ...

Partial Transcript of July 19, 1990 hearing on motions to appoint a trustee or an examiner at 31, *In re Colorado Ute Electric Association, Inc.,* Case No. 90 B 03761 C.

**12.** Colorado–Ute had already received a number of recommendations for management restructuring from the PUC Staff Audit which was completed in October of 1989. In Mr. Keith's

direct testimony affidavit he summarized the suggestions from that Audit stating:

> These suggestions dealt with such matters as financial reporting to the board, rate setting, monitoring of directors' expenses, development of a management succession plan, restructuring the board to infuse additional utility-related expertise, notification to the board of adverse developments, development of a formal strategic business plan, organizational restructuring for the purpose of enhancing managerial controls and accountability, evaluation of the necessity for outside consultants, hiring of a chief financial officer, review of its budgeting process and conduct of a cost benefit analysis in connection with future personnel reductions in force.

The report also found "that CUEA [Colorado–Ute] has not exercised the degree of sound financial management necessary to achieve a stable corporate structure." PUC, "Financial Audit and Management Review of Colorado–Ute Elec-

Most noteworthy were the following recommendations: recruit directors and committee members with specific skills and experience to address the special expertise required to successfully operate an electric utility; develop a standardized financial and accounting reporting package to accurately reflect the accounting records of Colorado–Ute; establish long-range strategic financial planning with goals and objectives that offer alternatives to a merger; a commitment to board training on strategic and financial planning; and evaluation and monitoring the performance of Colorado–Ute's management.

Colorado–Ute has implemented several recommendations from the audit and is trying to implement others, however, Mr. Coleman stated that there have been no new board members who have brought the skills and expertise suggested by Coopers & Lybrand.

Currently, Colorado–Ute has an application to employ an investment banker, Salomon Brothers, Inc., as financial advisors. The debtor requests approval of the appointment *nunc pro tunc*. The employment agreement provides for a $125,000 monthly fee to be paid to Salomon Brothers.

Another relevant fact is the transfer out-of-state of approximately $20 million in cash shortly prior to the filing of the bankruptcy petition. Apparently the transfer was made upon the advice of counsel. At the direction of Mr. Keith, Mr. Johnston transferred the money from a Denver National Bank Trust Account located in Denver, Colorado, to Team Bank in Fort Worth, Texas. Both Mr. Keith and Mr. Johnston stated that the money was transferred to make it more difficult for the creditors to locate the money and attach a lien to it.

Another fact at issue relates to Colorado–Ute's long-term contracts for the purchase of coal to fire its plants. Fuel costs consume approximately ⅓ of its operating budget. Specifically, the contract at issue is a long-term coal contract with Colowyo Coal for Craig 3. The contract contains a

provision which allows for renegotiation of the base price if there is a change in basic technology which reduces the cost of producing coal from the Colowyo Reserves. The contract is between Colowyo as seller and Colorado–Ute, Platte River Power Authority, Tri–State and Salt River Project as purchasers. The appointed agent for the buyers is Colorado–Ute, but there is a provision to replace the agent and designate a new agent. This contract was recently renegotiated to obtain coal at $14.79 per ton vs $28.85 per ton under the original contract, with a reservation of right to Colowyo to seek the difference in price.

There are several miscellaneous facts which deserve brief mention. The parties agree that until quite recently the relationship between Colorado–Ute and the PUC had been strained and at times adversarial. There was evidence that previous management, Mr. Krummins in particular, did not have good rapport with the PUC. Also, there was evidence that the accounting systems previously used were imperfect and difficult to reconcile. Colorado–Ute is attempting to modify its accounting system and consolidate it into one method of reporting. Lastly, since filing its petition for relief, Colorado–Ute has pursued discussions related to its reorganization with PSCo, Tri–State and PacifiCorp.

Finally, there are a few relevant facts related to the motion to appoint a trustee or a receiver filed by the REA and CFC, along with the statement in support of that motion filed by PSCo. As for REA and CFC, prior to filing the motion they requested that the debtor agree to terminate the exclusive period in which to file a plan or they would file a motion to appoint a trustee or a receiver. The debtor refused to terminate the exclusive period. Thus, REA and CFC filed the subject motion.

As for PSCo it informed the debtor that if the debtor did not accept PSCo's offer to purchase assets (which was made less than one week before the hearing to appoint a trustee), it would support the motion to appoint a trustee or a receiver. The debtor

tric Association, Inc.," Docket No. 89 M–230E, p.   3 (October 11, 1989).

did not accept the offer for various reasons, including certain provisions which it felt were unfair and unacceptable, and a desire to continue negotiations with PSCo and other interested parties. Hence, PSCo filed its statement in support.

The IREA, CFC and REA assert that it is appropriate to appoint a trustee due to the gross mismanagement and incompetence of the management and the creditors' lack of confidence in the management of Colorado–Ute. In support of their assertion of gross mismanagement, incompetence and lack of confidence in the management of the debtor they allege the following: historically, the debtor has not responded effectively to continuing losses; the management glossed over those losses to the board and its creditors, ignoring financial reality; the debtor has been confrontational and adversarial with the PUC; the debtor's unwise business decisions have damaged the estate— the failed merger with Tri–State; the prolonged rate decrease policy; failure to obtain co-op member support for rate increases; transfer of $20 million in assets shortly before filing its petition; failure to seize upon value in Cimmarron and Colowyo Coal contracts; inability to reconcile cash position and projections; the debtor has not responded to the threat of four members to leave; the debtor has focused primarily on spot excess power sales and no business plan is formulated; the debtor has not meaningfully pursued other options for reorganization; lack of experienced senior management and excessive reliance upon outside advisors. In addition, they contend that the board and members are divided due to parochial interests and that there is an inherent conflict of interest or gridlock on the board due to the Colorado–Ute directors wearing hats as both board members and creditor representatives of the co-op members. The REA and CFC also assert that the debtor has failed to adequately pursue member co-op setoffs.

The movants maintain that if the Court does not find cause to appoint a trustee, it is in the best interest of creditors to make such an appointment. They contend that due to mismanagement the creditors have lost confidence in the debtor. Furthermore, they argue that due to gridlocks on the board of directors an impartial leader with clear accountability is needed. Also, they are concerned about the debtor's bias toward one reorganization alternative. Thus, they conclude that an objective, capable trustee is required to manage the debtor's reorganization and preserve the integrity of the process.

The movants suggest that the appointment of a trustee need not displace the institutional memory or expertise that now exists in the staff.

Alternatively, the movants request the appointment of an examiner with expanded powers. They maintain that additional powers must be granted because the duties enumerated in 11 U.S.C. §§ 1104(b) and 1106(b) are not sufficient to allow the examiner to be as effective as is needed in this case to afford sufficient protection to the parties in interest. Some of the additional powers requested are: the power to formulate and negotiate a reorganization plan; the power to pursue sale or merger alternatives as part of such plan; and the power to represent the debtor before regulatory bodies.

Colorado–Ute maintains that the Court should not appoint a Trustee. It contends that the mistakes and bad business judgment of previous management should not be the determinative factor in the Court's decision. Instead, it asserts that the Court should consider the great strides achieved in restructuring management and the various attempts made over the last year to work out its financial problems. The debtor maintains that current management is capable of formulating a workable plan of reorganization.

The Creditors' Committee contends that the movants have failed to show cause to appoint a trustee. It maintains that the heart of the motions do not go to the operation of the debtor's business, but to the inability of the debtor, thus far, to fasten upon and implement a plan of reorganization. It asserts that the motion is not in the best interest of the *unsecured* creditors. In addition, the committee ar-

gues that the appointment of a trustee will result in the ouster of the current board of directors and may cause certain parties to contracts with the debtor to take the position that their contracts may not be assumed and assigned by a trustee under the Code.

The debtor and the Committee argue that the request to appoint a trustee is premature. They maintain that such a motion is not appropriate before the expiration of the exclusive period at least, or even later due to the complexity of this case.

Both Colorado–Ute and the Committee assert that the appointment of the trustee is not in the best interests of the estate because the potential benefits to the estate are greatly outweighed by the costs and expenses associated with the appointment of a trustee. They contend that it would be very expensive and consume a lot of time for the trustee to become familiar with the company and able to run the case. Moreover, the debtor maintains it would be hard to find a qualified individual who could leave a job immediately and take over Colorado–Ute for an indefinite period of time. The Committee also asserts that the cost of the bond to appoint a trustee would be a gross waste of estate assets. They contend that the appointment of a trustee which would extinguish the exclusive period pursuant to 11 U.S.C. § 1121(c)(1), would result in confusion and protracted litigation over competing plans of reorganization.

Colorado–Ute and the Committee question the motives of the parties requesting the appointment of a trustee. The debtor and the Committee maintain that the IREA, REA and CFC filed the motions based more upon their own private agendas than any actual need for a trustee. In addition, the debtor views PSCo's support of the motion as tantamount to blackmail.

Finally, the Committee and the debtor maintain that the appointment of an examiner with limited powers would be in the best interests of the estate. They have proposed that an examiner be appointed to chair a negotiating committee to act as a mediator and facilitator with respect to the development of a consensual plan of reorganization.

■ The first issue before the Court is whether a trustee should be appointed. The appointment of a trustee in a reorganization case is governed by 11 U.S.C. § 1104(a) which states:

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

The burden is on the movant to show by clear and convincing evidence that there is cause to appoint a trustee. *E.g., In re Evans*, 48 B.R. 46, 47 (Bankr.W.D.Tex. 1985).

■ Before deciding a motion to appoint a trustee, the case authority sets forth general points which must be considered. The first is that the appointment of a trustee is an extraordinary remedy. *E.g., In re Cardinal Industries, Inc.*, 109 B.R. 755, 765 (Bankr.S.D.Ohio 1990). "There is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee." *In re Ionosphere Clubs, Inc. (Eastern Airlines)*, 113 B.R. 164, 167 (Bankr.S.D.N.Y.1990). However, "Section 1104 represents a potentially important protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-posses-

sion." *In re V. Savino Oil & Heating Co., Inc.,* 99 B.R. 518, 525 (Bankr.E.D.N.Y. 1989).

■ The first subsection of Section 1104(a) provides for the appointment of a trustee for "cause." If the Court finds that cause for the appointment of a trustee exists, the Court has no discretion, but must appoint a trustee. *E.g., In re Oklahoma Refining Co.,* 838 F.2d 1133, 1136 (10th Cir.1988). The Court need not find any of the enumerated wrongs in the statute to find cause to appoint a trustee. *Id.* (citations omitted).

The case authority dealing with gross mismanagement and incompetence recognizes that typically there is some degree of mismanagement or incompetence in most businesses which file for protection under Chapter 11. *See Eastern Airlines,* 113 B.R. at 165, 168 (Bankr.S.D.N.Y.1990). One case, *In re Mako, Inc.,* 102 B.R. 809, 812 (Bankr.E.D.Okla.1988), has attempted to define incompetency and gross mismanagement. The court stated, "[i]ncompetency has its roots in mismanagement, requiring a showing of a lack of business acumen and ability ... Gross mismanagement suggests some extreme ineptitude on the part of management to the detriment of the organization. But it must rise above simple mismanagement to achieve the level envisioned by the Code." (Citations omitted.) (There the court found that cause did not exist to appoint a trustee, notwithstanding that the debtor's president had engaged in numerous insider loans, may have failed to segregate funds in accordance with a trust agreement, and may have discriminated among suppliers as cash flow became a problem.)

The movants point out that future plans, revealed by current management, will not condone past management frauds, dishonesty, gross mismanagement, or incompetence to overcome the requirement of § 1104(a)(1) to appoint a trustee. *In re La Sherene, Inc.,* 3 B.R. 169, 175 (Bankr.N.D. Ga.1980).

The movants rely on a number of cases in support of their assertion that a trustee should be appointed for cause. One is the case of *In re Cardinal Industries,* 109 B.R. 755 (Bankr.S.D.Ohio 1990), the court found that the cumulative effect of various events caused a loss of confidence in the debtor's management of "crisis proportions", constituting cause to appoint a trustee. In that case the debtor failed to appropriately respond to tax law changes which impaired its ability to market properties; the debtor failed to find significant alternative markets, yet could not continue to provide required financial support; there were impermissible cash transfers which caused key properties to default on their mortgages; the management vacancies due to firings were not filled; the debtor had not stemmed cash losses; and the debtor had not adequately pursued disposition of unneeded marketable assets.

The movants also cite those cases which in finding cause to appoint a trustee gave considerable import to the inability of debtor's management to function effectively due to lack of creditor confidence and conflict within the debtor. *E.g., In re Microwave Products of America, Inc.,* 102 B.R. 666 (Bankr.W.D.Tenn.1989); *In re Sharon Steel Corp.,* 86 B.R. 455, 460 (Bankr.W.D. Pa.1988), *aff'd,* 871 F.2d 1217 (3d Cir.1989); and *Eastern Airlines,* 113 B.R. 164.

The movants directed the Court to the case of *Wabash Valley Power Association v. Rural Electrification Administration,* 903 F.2d 445 (7th Cir.1990), which discusses the conflict between a non-profit generation and transmission utility, its members and creditors. Judge Easterbrook addressed the inherent conflict surrounding a decision to lower utility rates. He noted that a conflict is created between what is best for the utility, the cooperative members and other creditors. Furthermore, in *dicta,* Judge Easterbrook stated that he was "surprised that the bankruptcy judge has allowed Wabash to operate a debtor-in-possession, when the clash of interests between creditors and its current management is so obvious." *Id.* at 451.

In response, the debtor notes that the *Eastern Airlines, Sharon Steel,* and *Cardinal Industries* conflict cases are distinguishable from this case. In particular the

debtor contends that those cases involved serious conflicts of interest, including large transfers for the benefit of insiders. In addition, the debtor states that while the debtor-in-possession in those cases continued to show substantial operating losses for extended periods of time, Colorado–Ute (post-petition) has not been operating at a loss. As for the *Wabash* decision, the debtor asserts that it is able to protect the interests of creditors and notes that it has commenced some collection actions against its co-op members.

The debtor cites cases which mitigated the gross mistakes of the past by focussing on the rehabilitation efforts of current management. *See In re General Oil Distributors, Inc.*, 42 B.R. 402 (Bankr.E.D.N. Y.1984); *In re Crescent Beach Inn, Inc.*, 22 B.R. 155 (Bankr.D.Me.1982).

Finally, the debtor and the Committee direct the Court to those cases which have found motions to appoint a trustee premature when filed within the debtor's exclusive period for filing a plan of reorganization. *E.g., In re Allsun Juices, Inc.*, 34 B.R. 162 (Bankr.M.D.Fla.1983).

■ As a preliminary matter, the Court is not persuaded by Colorado–Ute's reliance upon cases which find motions to appoint a trustee filed within the original exclusive period to be premature. Those cases involved situations where the courts first found that there was not cause to appoint a trustee and that such appointment was not in the best interests of creditors. Then, the courts discussed the timing and propriety of the motions. Thus, if the facts and circumstances warrant the appointment of a trustee, it is not appropriate to wait to file the motion until the termination of the exclusive period. Such a deferral will only further delay the progress toward the effective rehabilitation and reorganization of the debtor.

■ The Court has carefully reviewed the law and evidence in this case, and even after focusing on the current management's efforts, finds that cause does exist to appoint a trustee. First, the Court finds that the conflicts between and among Colorado–Ute and the board of directors are formidable. The co-op members are divided on the issue of the appointment of a trustee, several members desire to seek alternative power sources and there appears to be a division on whether the members would consider a rate increase. The former chairman and vice chairman resigned due to conflict between what their respective co-ops desired and what was best for Colorado–Ute. Notwithstanding the employment of numerous numerous professionals, the Court cannot envision management and the board functioning effectively and efficiently to reorganize Colorado–Ute.

Furthermore, the Court does not find that the current board and management are competent to reorganize the debtor. Little has been done to address the recommendations to Colorado–Ute by the PUC Staff Audit and Coopers & Lybrand to infuse additional utility-related expertise in both management and the board. Absent significant outside help, it does not appear that management and the board will be able to understand and develop strategic long-range financial planning for Colorado–Ute. The testimony of Messrs. Keith and Johnston supported some of the strides that Colorado–Ute has made in restructuring its operations, but their sincerity and hard-work cannot overcome their lack of financial sophistication, experience and business acumen needed to effectively reorganize this billion dollar business. In addition, it appeared to the Court that Mr. Coleman, the chairman of the board, did not grasp the complexity of the reorganization process and the necessity that the board and management have direction and expertise from within, not just from outside professionals.[13]

---

13. The Court was astonished by the extent to which the board relied and continues to rely upon management reports of work performed by outside professionals, workouts and reorganization proposals, without the board directly reviewing or apprising themselves of vital information.

Although the management and board say that communications have greatly improved between the them, the Court does not find that

In addition, the Court finds that a number of the creditors do not have confidence in the debtor-in-possession's ability to reorganize. The Court, like the debtor and the Committee, initially questioned the motives of REA and CFC based upon their offer not to request appointment of a trustee if the debtor would terminate the exclusive period.[14] However, testimony revealed that those creditors do not lack confidence in management's ability to operate the utility, e.g., keeping the power on, their concern is that management and the board lack the ability to reorganize the debtor. Hence, termination of the exclusive period would allow others to present plans of reorganization.[15] Thus, based upon the evidence and facts before it the Court concludes that the creditors sincerely and justifiably lack confidence in management.

Since the Court has found cause on other grounds, it is not necessary for the Court to delve into the historical management to evaluate if there was gross mismanagement of Colorado–Ute.

In sum, the Court finds cause to appoint a trustee pursuant to Section 1104(a). The Court cannot envision a way for the current management and board to resolve the inherent conflict between what is best for Colorado–Ute, its creditors and the co-op members. In addition, the Court is deeply concerned that due to management and the board's lack of business acumen, they cannot conduct the required independent evaluation of proposals and recommendations made by the hired professionals or by interested suitors.

As to whether the appointment of a trustee is in the best interest of creditors pursuant to Section 1104(a)(2), the court should "eschew rigid absolutes and look to the practical realities and necessities." *Eastern Airlines*, 113 B.R. at 168 (citation omitted). The court should also consider the following four factors:

(i) the trustworthiness of the debtor;

(ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;

(iii) the confidence—or lack thereof—of the business community and of creditors in present management;

(iv) the benefits derived by the appointment of a trustee, balanced against the costs of appointment.

*Id.* (citations omitted).

Perhaps the two most relevant factors in this case are the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; and the benefits derived by the appointment of a trustee, balanced against the costs of appointment. As for the debtor's past and present performance, an assessment of the overall management of the debtor corporation and the experience, skills and competence of the debtor-in-possession weigh heavily in favor of a trustee. In the two years preceding bankruptcy Colorado–Ute suffered $127,748,719 in net losses. The projected net losses for this year are $38,296,800. Moreover, the serious conflicts in this case between and among the debtor, its board and creditors make the prospect for gridlock seem more probable than the ability to rehabilitate the debtor. *E.g., In re Ad-*

---

sufficient progress has been made. For example, Mr. Coleman was completely unaware of management's "suspension" of the contract with Smith–Barney and their opinion that the $953,970 paid to Smith–Barney was excessive for the product received. Though Mr. Coleman has only been the chairman of the board for a short while, he was on the board during that time and should have been aware of what transpired.

**14.** Although CFC attempted to argue that it recently became aware of the $20 million pre-petition transfer which made it seriously question the integrity of current management, the Court finds that argument to be disingenuous. The REA's motion to examine management about the transfer was filed on June 14, 1990, and

granted on July 20, 1990. An article on the issue was in the newspaper shortly thereafter. It is difficult for the Court to imagine that CFC only recently learned of the transfer and if the transfer did deeply concern CFC, why it was not mentioned in the exhaustive testimony of its witness which was filed on July 13, 1990.

**15.** On the other hand, it appears that PSCo filed its support of the motion in fulfillment of its warning that it would do so if Colorado–Ute did not accept its subject offer. The Court does not countenance the tactical use of a motion as significant as a motion to appoint a trustee as retribution for the debtor's failure to carry out a particular creditor's demands.

*vanced Electronics, Inc.,* 99 B.R. 249 (Bankr.M.D.Pa.1989). Unless Colorado–Ute is placed in the hands of an experienced, capable party who can make informed and directed decisions to reorganize this utility, it is not likely that the substantial losses will slow down soon enough to enable successful rehabilitation of the debtor, rather than liquidation.

As for the benefit derived from the appointment of a trustee balanced against the cost, the Court finds in favor of the appointment of a trustee. There will be expense in the appointment of a trustee. The trustee will need counsel,[16] the trustee will need some time to familiarize himself or herself with the operations of the debtor and to review the various options explored by the debtor thusfar. The trustee may need to hire some outside professionals for assistance. There also is the necessary expense of a bond.

The benefits from the appointment of a trustee are many. First, and most importantly, it will place a capable and objective party in control of the debtor in whom the parties will have confidence in his or her ability to reorganize the debtor. The trustee as a fiduciary of the estate will be mindful of his or her duties to all constituents and will not be controlled or stymied by one particular group.

Second, it is probable that the cost of the professionals for the trustee will not exceed, and may be quite less, than that which would be required by the debtor. In all likelihood, an experienced trustee will not need to hire an investment banker. Also, to the extent that professionals are hired, a great benefit will be derived by having their information and recommendations appropriately evaluated by an independent party. Moreover, if a party is appointed in whom the creditors have confidence, they may be less confrontational and litigious and more willing to work with Colorado–Ute.

While the cost of the bond may be substantial, when it is placed in the bigger picture of the administrative expenses and proposed expenses in this case, it is a small price to pay for the benefit to be received.

The Court does not find that the case need to come to a halt during the time required to select a trustee, and for such person to familiarize himself with the case. Furthermore, the trustee may determine to retain current management throughout this case to operate the debtor, and to assist and support the trustee.

Finally, there was some concern expressed about competing plans and the problems that may be created thereby. The Court is perfectly able to establish effective methods to deal with competing disclosure statements, plans and solicitation of acceptances.

The Court's determination to appoint a trustee moots several matters. First, the Court does not need to address the issue of the appointment of an examiner. Second, the stipulation to appoint an examiner filed by the debtor and the Committee is mooted. Finally, the appointment of a trustee automatically terminates the debtor's exclusive period to file a plan, accordingly no further hearings will be held on the various requests for termination and extension of that time.

In conclusion, the Court finds that a trustee should be appointed pursuant to 11 U.S.C. § 1104(a). The movants have demonstrated by clear and convincing evidence that cause exists to appoint a trustee and that it is in the best interest of creditors to appoint a trustee. Hence, after consultation with Colorado–Ute's management and the board of directors, REA, CFC, the Unsecured Creditor's Committee and the PUC, the United States Trustee should select and appoint, subject to the Court's approval, a disinterested and capable individual to serve as trustee of this case.

ORDERED that the motion of the IREA, REA and CFC to appoint a trustee is granted.

---

**16.** The trustee may need to hire out-of-state counsel due to the current involvement in this case of most of the local bankruptcy firms with the staff and ability to represent the trustee.